Anthony P. La Rocco (APL 5986)
David S. Kwon (DK 3046)
**KIRKPATRICK & LOCKHART**
**PRESTON GATES ELLIS LLP**
One Newark Center, 10th Floor
Newark, New Jersey 07102
Phone: (973) 848-4000
Fax: (973) 848-4001
*Attorneys for Plaintiff*
*Black Box Corporation*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| BLACK BOX CORPORATION<br><br>                    Plaintiff,<br><br>v.<br><br>AVAYA INC.,<br><br>                    Defendant. | Civil Action No. _____<br><br><br>**COMPLAINT AND JURY DEMAND** |

Plaintiff Black Box Corporation ("Plaintiff" or "Black Box"), through its undersigned counsel, Kirkpatrick & Lockhart Preston Gates Ellis LLP, avers as follows:

### THE PARTIES

1.      Plaintiff Black Box is a Delaware corporation, organized and existing under the laws of the State of Delaware, with its principal place of business in Lawrence, Pennsylvania.

2.      Defendant Avaya Inc. ("Defendant" or "Avaya") is a Delaware company, organized and existing under the laws of the State of Delaware, with its principal place of business in Basking Ridge, New Jersey.  Avaya was spun off from Lucent, which also, at all relevant times, maintained its principal place of business in New Jersey.  On October 26, 2007,

Avaya announced that it had been acquired by Silver Lake Partners and TPG Capital in a transaction valued at approximately $8.3 billion.

## JURISDICTION AND VENUE

3.     This Court has federal question subject matter jurisdiction pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331 and 1337.

4.     Venue is proper in the District of New Jersey pursuant to 15 U.S.C. § 22 in that Avaya is located, may be found, and transacts business in this District and, pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to the claim occurred in New Jersey, and Avaya maintains a business address in New Jersey and solicits and does business in New Jersey.

## INTERSTATE COMMERCE

5.     The actions complained of herein have and will restrain and adversely affect interstate commerce in that Avaya sells its products and services across state lines and Black Box sells its service and maintenance of Avaya telecommunications equipment across state lines, and both companies purchase and sell goods and supplies in interstate commerce.

## GENERAL ALLEGATIONS

I.     **Avaya's Relevant Corporate History**

A.     **Introduction**

6.     Defendant Avaya has engaged in a determined and continuing attempt to restrict competition in the U.S. market for the service and maintenance of enterprise telephone systems built by Avaya and its predecessors, Lucent Technologies, Inc. ("Lucent") and American Telephone and Telegraph Company ("AT&T").  Avaya was spun off from Lucent in September 2000, itself a spin-off of AT&T, the original telecommunications monopoly.  But Avaya has not been content simply to accept the legitimate benefits that come from the fact that, at the time of AT&T's 1984 break-up, virtually all large U.S. businesses had AT&T (now Avaya telecommunications) platforms and that many owners have since upgraded those systems to

Lucent and now Avaya systems rather than replace them with equipment sold by the different original equipment manufacturers ("OEMs") that subsequently entered the market.

7.      Instead, Avaya has unlawfully leveraged its monopoly power over owners of the Avaya (and Lucent and AT&T) platforms to maintain a monopolistic stranglehold on the separate market for post-warranty service and maintenance of such systems.  Avaya is able to maintain its monopoly on the service and maintenance aftermarket, not by offering better service or lower prices, but because equipment owners are locked into their Avaya/Lucent/AT&T platform – their huge investments in their Avaya platform, the long life of the equipment, and the monumental cost and risk of switching to a different telecommunication platform make switching to another platform economically untenable.

8.      Plaintiff Black Box is a growing company specializing in, *inter alia*, the maintenance and service of various telecommunications systems manufactured and sold by Avaya, including the Avaya "Definity" platform.[1]  Along with other competitors (known as independent service providers or "ISPs"), Black Box has, until recently, competed vigorously with Avaya to provide service and maintenance for AT&T, Lucent and Avaya enterprise communications platforms ("ECG Platforms"[2]).  Black Box customers have a high level of satisfaction with Black Box, are better served by Black Box than they had been by Avaya, and have saved substantial amounts of money in recurring maintenance charges by using Black Box instead of Avaya.

---

[1] Avaya and its predecessors have manufactured, sold and serviced, and Avaya currently manufactures, sells and services, a line of "Private Branch Exchanges" ("PBX") telecommunications systems and equipment under various brand names, including: System 75, Definity, and Communications Manager.  PBXs are a small version of the telephone company's central office switch and are the predominant, traditional voice switching system used by mid-to-large sized enterprises to connect their employees' voice and data telecommunications needs internally and to the public networks.

[2] Avaya's Enterprise Communications Group is responsible for this line of business which services the communication needs of varying sized enterprises.

9.     In the late 1990's and early 2000's, Lucent, and then Avaya, deliberately downsized their service and maintenance personnel ranks, thereby creating an unserved demand. That demand began to be filled by competition from Avaya's own dealers (known as "BusinessPartners") and ISPs.  For several years, Avaya held annual Avaya BusinessPartner meetings, at which, among other things, Avaya encouraged its BusinessPartners to invest in personnel, training, and equipment to be better able to provide service and maintenance to Avaya ECG customers.

10.     Realizing that it could lose its stranglehold on the lucrative market for services and maintenance of Legacy Platforms, Avaya put in place an anticompetitive and deceptive scheme to maintain its dominance.  First, Avaya prevented its BusinessPartners from (a) offering service and maintenance to Avaya's existing maintenance customers, and (b) competing with Avaya for new business from a class of larger customers, which Avaya considered its "named accounts" and "strategic accounts."  Then, Avaya and certain of its BusinessPartners conspired and agreed to allocate the remainder of the market to the BusinessPartners by excluding competition from ISPs.

11.     Avaya has accomplished this by restricting ECG Platform purchasers' access to their own telephone systems.  Avaya installs in its ECG Platform systems – often without informing the purchasers – several layers of passwords and permissions including MSPs or DADMINs that are designed to prevent anyone not authorized by Avaya from accessing the embedded system commands that permit both remote and on-site service and maintenance. MSPs, which stand either for Maintenance Service Permissions or Maintenance Software Permissions are permissions that a customer, using a customer super-user login, can access if they are enabled or turned on.  For all releases in which MSPs were available, there would be a need to enable or turn on the MSPs by accessing the system and making a bit change – essentially switching a one to a zero (or vice versa).  In later releases following introduction of a license file scheme using the Remote Feature Activation process – an additional layer of protection - delivery of a license file – was required, before MSPs could be enabled (or

DADMINs could be activated).   Thus, MSPs are not a separate login, i.e., username and password, and instead enhance the permissions, or the scope of commands, that a customer using a super-user login can perform.   Customers generally have two logins – a user and super-user; users are generic for anyone who uses the phone system, and super-user can perform more admin functions, typically reserved for the in-house IT personnel.   DADMIN, on the other hand, is a separate login created by Avaya subsequent to introductions of MSPs to provide a login specifically for BusinessPartners.   Avaya's often undisclosed passwords policy has the primary function of preventing competing service providers and owners from accessing the maintenance and service commands necessary for maintenance and service of the systems owned by the customer.   Avaya also seeks to prevent ISPs from accessing the ECG Platform systems for any maintenance, service, or support.

12.     In order to prevent ISPs from accessing the ECG Platform systems, Avaya has developed a tangled web of logins, passwords, and permissions.   Avaya customers generally have two logins:  (1) a generic user login for anyone using the telephone system, and (2) a super-user login allowing the super-user to perform more administrative functions.

13.     In addition to customer logins, Avaya installs Maintenance Service Permissions or Maintenance Software Permissions ("MSPs") which are additional permissions that a customer can access using a customer super-user login once enabled.   MSPs enhance the scope of commands that a customer can perform.   As further described below, Avaya does not fully disclose to its customers the limitations on maintenance and commands that they can perform without the use of an MSP.

14.     Avaya also installs the Remote Feature Activation process which is yet another layer of protection requiring delivery of a license file before MSPs can be enabled.   All logins, passwords, and permissions installed by Avaya serve to restrict access only to those service providers authorized by Avaya.

15.     Subsequent to introductions of MSPs, Avaya created and installs separate logins, commonly known as DADMINs, to provide a login specifically for BusinessPartners, thus

further preventing ISPs from providing service and maintenance to ECG Platform system customers.

16.     Avaya's anticompetitive scheme harms the Avaya equipment owners by eliminating competition from Avaya's would-be service and maintenance competitors, including Black Box.  By eliminating competition from Black Box and other ISPs, Avaya's scheme permits it to charge higher prices for its parts, maintenance, and service than it could in a competitive market.  Avaya's scheme also allows it to mandate when owners are forced to buy upgrades by refusing to provide service and maintenance support for any outdated systems while deciding when a system is "outdated," and by blocking access to prevent ISPs from providing support.

17.     By concealing the fact that purchasers would not be allowed to obtain maintenance and service from anyone but Avaya or its co-conspirator BusinessPartners, Avaya made it impossible for purchasers to calculate the true life-cycle cost of an Avaya ECG Platform. Because the other OEMs that compete with Avaya (including Nortel, Cisco, NEC, and Siemens) do not impose similar restrictions, and Avaya itself does not impose similar restrictions on many of its other products, purchasers have been misled into thinking an Avaya ECG Platform was competitively priced when in fact it was not – the higher service and maintenance costs that result from Avaya's service and maintenance monopoly mean that the actual "life-cycle cost" of an Avaya ECG Platform may end up being much greater.  But because the replacement cost of an enterprise telephone system is so great, owners of such systems are effectively locked into keeping the system for its entire useful life.  Once so locked in, owners have no effective alternative but to pay Avaya or its co-conspirator BusinessPartners whatever they choose to charge for service and maintenance, whether in a maintenance contract or on a time and material basis, for the duration of the ECG Platform's useful life.

**B.     AT&T:  Avaya's Monopolistic Roots**

18.     For most of its history, American Telephone and Telegraph Company ("AT&T") functioned as a legally sanctioned, regulated monopoly.  Given the nature of the technology of

telephone systems and service through the first part of the 20th century, AT&T was able to maintain the government's acceptance of the principle that the telephone system could operate more efficiently as a government-regulated monopoly providing universal service, and was an appropriate and acceptable substitute for the competitive marketplace.

19.     As a result, AT&T maintained a monopoly in all of the various markets associated with the telecommunications industry, including the manufacturing and leasing, and then selling, of telecommunications systems to businesses.

20.     By virtue of its manufacturing monopoly, AT&T also maintained a monopoly for the service and maintenance of such systems.  AT&T historically offered expensive service and maintenance options to purchasers of its enterprise telecommunications products, and purchasers had no choice but to utilize AT&T for their service and maintenance needs.

21.     However, technological changes and developments in the middle of the 20th century offered additional alternatives to the AT&T long-distance phone system, and lowered the barriers to entry by would-be competitors in the long-distance service and telephone manufacturing markets.

22.     These technological and market changes in telecommunications eventually led to an antitrust suit by the U.S. government against AT&T in 1974.  The lawsuit was settled in 1982, when AT&T agreed to divest itself of the wholly-owned Bell operating companies that provided local exchange service, the parts of AT&T that the government believed were still valid natural monopolies, from those parts where competition was appropriate.  The divestiture took place in January 1984, leaving, in its place, a new AT&T and regional operating companies.

23.     Although a new AT&T was born as of January 1984, it inherited a corporate culture based on a decades-long existence as a regulated monopoly largely insulated from market pressures for most of its history.

**C.      AT&T's Gradual Adoption of a Dealer Sales Channel**

24.     As part of AT&T's divestitures of local telephone companies pursuant to its 1982 settlement of the U.S. government's 1974 antitrust / monopolization suit, AT&T developed a

new business unit, AT&T Technologies, Inc. ("AT&T Technologies"), which had separate market-focused business units to manufacture and sell consumer products, network systems, technology systems and information systems.  In 1989, AT&T Technologies branched into several business units, including AT&T Network Systems, AT&T Global Business Communication Systems, AT&T Microelectronics, and AT&T Consumer Products.

25.    AT&T Technologies and its business units primarily followed AT&T's historical direct marketing and servicing business model, whereby the company would sell its telecommunications systems equipment (including operating software) directly to the enterprise owner and attempt to sell it a separate maintenance contract once the warranty terminated.

26.    At first, AT&T Technologies enjoyed complete command or the enterprise telecommunications equipment manufacturing and sales market, as owners who were not already locked into the AT&T telecommunications platform initially lacked any meaningful choice of manufacturers.

27.    AT&T Technologies also maintained complete control over the separate market for service and maintenance of its equipment.

28.    With the benefit of this historical control of the manufacturing and sales market, in 1984, AT&T unveiled System 75 as its enterprise PBX platform for large businesses.  System 75 could be seamlessly and economically upgraded to Definity, so when Definity was introduced in 1992, many owners chose to upgrade.  Likewise, Communications Manager was introduced in 2002 (Communications Manager was temporarily known as "MultiVantage").  Owners with Definity platforms could, again, seamlessly and economically migrate to Communication Manager.  All of these brands make up what the telecom industry widely refers to as the "Definity" platform.

29.    However, the industry's deregulation eventually resulted in numerous competitors entering the manufacturing and sales market.

30.     Contrary to AT&T's direct sales marketing business model, the majority of these new competitors approached the manufacturing and sales market using a dealer channel sales model.

31.     AT&T Technologies, however, carried over and initially clung to its direct sales model.

32.     The dealer sales model became more common in the telecommunications industry, and led naturally to the emergence of a competitive service and maintenance market for equipment manufactured by other companies, as dealers for competitive OEMs began offering their own post-warranty service and maintenance for equipment they sold.

33.     As a result of the increased competition from other manufacturers, many of whom utilized a dealer sales model, AT&T's market share of the sale of new telephone systems began to drop over the course of a decade.  Even so, its control of the embedded enterprise market share remained high due to the costs and risks to an owner of switching telecommunications platforms.

34.     In the early 1990's, in reaction to growing competition from other telephone equipment manufacturers, AT&T Technologies incorporated a dealer sales model and began utilizing the services of outside companies to sell directly to purchasers.

35.     AT&T Technologies, however, only allowed most dealers to work with small businesses, and restricted most dealers from working with the Definity platform.   AT&T continued its direct sales marketing model as well, particularly with respect to its existing large enterprise owners.

36.     Even with the increased competition from other manufacturers, AT&T was able to protect its status as a market leader for the manufacture and sale of enterprise telecommunications systems by converting many existing owners of AT&T equipment to the Definity platform and then upgrading an owner's specific system within that platform.  Given the significant useful life of the Definity platform, AT&T could offer an upgrade to an owner's Definity system that was seemingly less expensive to an owner than purchasing an entirely new

system from another manufacturer, and less burdensome than having to install an entirely new system and train employees on the use of the new system.

       **D.**      **AT&T's Spin-Off of Lucent**

     37.    In October 1996, AT&T spun-off the business units of AT&T Technologies, which were combined with significant portions of Bell Labs to form Lucent Technologies.  At its launch, Lucent was immediately a major player in numerous telecommunications industries and markets, including the sale of enterprise telecommunications systems.

     38.    As with AT&T, Lucent protected its status as a market leader for the manufacture and sale of enterprise telecommunications systems by maintaining its use of the Definity platform and upgrading an owner's specific system within that platform.

     39.    As with AT&T, Lucent marketed its products via both a direct sales marketing model and a dealer sales model.  Lucent utilized dealers for the sale of its equipment, but at the same time controlled the service and maintenance of its products by confining dealers to smaller clients.

     40.    Lucent also continued AT&T's model of directly offering service and maintenance contracts to AT&T and Lucent equipment owners.

     41.    Given the prevalence of AT&T and Lucent products in the manufacturing and sales market, coupled with the direct sales model historically employed by AT&T and then Lucent, Lucent inherited a substantial business for the sale of service and maintenance contracts to owners of Definity and other ECG Platform equipment.

     42.    From 1996 through 2000, Lucent kept almost total control of the market for the service and maintenance of Definity and other ECG Platform equipment, with most large businesses using Definity systems, purchasing and then renewing Lucent service and maintenance contracts.

     43.    During this time, Lucent serviced owners of Definity and other ECG Platforms through its own, in-house staff of experienced and qualified technicians.

E.    **The Downturn in the Telecommunications Industry in 2000, the Birth of Avaya and the Development of a Competitive Service and Maintenance Market for Definity Equipment**

44.    In or about 2000, in response to the recession that impacted the telecommunications industry as a whole, Lucent began significantly downsizing its operations, culminating in a massive layoff in early 2000.

45.    As a result of Lucent's termination of a significant portion of its workforce, Lucent's direct sales, service, and maintenance capabilities were all greatly diminished.

46.    Upon information and belief, to compensate for its reduced personnel resources and avoid any loss of product market share, Lucent increased its indirect sales channel through the launch of its "BusinessPartner" program in February 2000.

47.    Lucent also responded to the 2000 downturn by shedding various business units. This included the spin-off of its "enterprise networking group," completed in September 2000, as a new company, Avaya.  Avaya claims to be a leading global provider of business communications applications, systems and services to businesses including more than 90 percent of the Fortune 500 companies.

48.    After its spin-off from Lucent, Avaya further reduced its direct sales, service, and maintenance capabilities with another round of layoffs in July 2001.

49.    Upon information and belief, as a result of continued downsizing, Avaya lost many of its employees who had serviced its owner base.

50.    To compensate for the further reduction in its workforce, Avaya informed its dealers that it would shift management of some sales accounts, particularly for smaller to mid-sized businesses, to its dealers.

51.    Avaya also began to encourage its dealers to further increase their service capabilities.  As Avaya increased its reliance on dealers, Avaya encouraged them to increase the quality and scope of the service and support provided to Definity and other ECG Platform owners.  Avaya encouraged its dealers to hire Avaya's laid-off employees and make additional investments to be able to service and maintain the Avaya / Lucent / AT&T systems.

52.     Avaya represented to dealers that it would rely on them to provide more direct technical services to the eighty percent of its customer base representing smaller to mid-size companies.

53.     Upon information and belief, Avaya contracted with its dealers as subcontractors to both service its Definity, other ECG Platform, and PDS equipment owner base and fulfill some of its maintenance obligations to these owners.  In doing so, Avaya hoped and expected its dealers would continue to sell Avaya maintenance contracts that the dealers would help fulfill.

54.     To achieve its reduction in workforce while ensuring that owners were properly serviced, Avaya sought to place its maintenance and service employees who were laid-off or received "early retirement" with its more significant dealers.  Avaya even offered to pay dealers up to 50% of the first-year salary of any former Avaya technical resource employee they hired.

55.     As part of an initiative to further enhance dealer support and service to owners, Avaya also implemented programs awarding higher status under designations such as Gold and Platinum to "BusinessPartners" who satisfied certain guidelines.  Certification was based on four factors: (a) business engagement, *i.e.*, revenue; (b) competence, *i.e.*, the number and level of Avaya-certified individuals; (c) customer support, including post-warranty maintenance; and (d) customer satisfaction.

56.     Avaya permitted business partners to offer competitive maintenance service. Responding to Avaya's incentives and meeting the highest levels of Avaya's benchmarks, Black Box became a Platinum BusinessPartner.

57.     The reduction in Avaya's workforce, however, dramatically and negatively impacted Avaya's own service levels and performance, and created initial significant dissatisfaction within Avaya's customer base.

58.     This dissatisfaction, in turn, created a market for competitive service and maintenance, as existing and new Definity, and other ECG Platform and PDS platform owners began necessarily to seek alternative maintenance contracts directly from dealers or, alternatively, independent third-party service providers.

II.     **Black Box's Relationship with Lucent and Avaya**

A.      **Black Box History**

59.     Black Box was originally formed in 1975 as a small company known as Expandor selling connectivity devices in Western Pennsylvania.  In 1982, the company changed its name to Black Box, while expanding to meet customers' needs in all states.  Black Box has continued to expand both nationally and internationally, providing network infrastructure services.  Currently, Black Box sells, installs, services, and maintains enterprise telecommunications systems and provides hot-line services in all fifty states as well as abroad.

B.      **Following Avaya's Spin-Off, Service Providers Which Black Box Acquired Became Avaya BusinessPartners**

60.     When Lucent spun-off Avaya in 2000, Lucent assigned its dealer contracts to Avaya.  Following the Avaya spin-off, through a series of acquisitions and mergers during 2000-2005, Black Box became an Avaya dealer and began marketing Avaya products, including the Definity platform and other ECG Platforms.

61.     Recognizing the opportunity created by Avaya's diminished capacity and the resulting demand by Definity and other ECG Platform owners for better service, Black Box also began offering its own maintenance contracts to owners and actively competing for Avaya's existing maintenance contracts.

62.     Upon information and belief, other dealers similarly invested significantly to enhance their service capabilities by creating their own networking operating centers, hiring former Avaya employees, and training technicians to meet the service and maintenance needs of Definity platform owners.

63.     Thus, while Avaya may have hoped that Black Box and other dealers would limit their competitive activities to servicing smaller equipment owners, Black Box and other dealers began to compete effectively for Avaya's entire maintenance and service owner base,

substantially increasing their respective revenue and concomitantly cutting into Avaya's market share.

64.     Avaya actively discouraged competition for its ECG Platform customers and effectively "punished" BusinessPartners and ISPs who attempted to compete for historic Avaya customer service and maintenance contracts.  Meanwhile, Black Box was regularly contacted by Avaya customers who were unhappy with Avaya service and maintenance, requesting that Black Box enter into contracts to provide service and maintenance of their Avaya ECG Platform systems.

65.     Upon information and belief, even with their success, the service and maintenance business of Black Box and other dealers still only represented a small portion of the market for the service and maintenance of Definity and other ECG Platform equipment, with Black Box holding a relatively small portion of this market.

**C.     Black Box Enters ECG Maintenance and Service Market**

66.     Black Box positioned itself to fulfill the growing demand by Definity and other ECG Platform owners for better maintenance and service at a lower price.  To that end, Black Box expanded its business and capacity through mergers and stock and asset acquisitions.

67.     In January 2000, Black Box purchased all the issued and outstanding stock of Delaney Electrical Services, Inc. and Delaney Telecom, Inc. (collectively the "Delaney Companies") for approximately $19,000,000 plus certain potential earn-outs and other consideration.  The Delaney Companies operated structured cabling design, telephone sales, installation, service and maintenance and electrical contracting businesses, including maintenance, and service to Avaya ECG Platform owners.

68.     The Delaney Companies were authorized Avaya products distributors.  At the time of the stock purchase, the Delaney Companies were party to three agreements with Avaya (as successor to/assignee of Lucent): a Master Construction Agreement, dated as of September 15, 1999; a Dealer Agreement, dated as of June 7, 1999; and an Authorized Systimax SCS Value

Added Reseller Agreement, dated as of April 10, 1997. Avaya terminated the Delaney Companies' most recent Reseller Agreement as of June 25, 2005.

69.     In April 2000, Black Box and Teldata Corporation ("Teldata") signed a merger agreement. Pursuant to that agreement, Black Box paid approximately $12,000,000 in Black Box stock plus certain potential earn-outs to the owner of Teldata. Teldata Corporation provided telecommunications systems, including PBX and structured cabling design, installation, and maintenance services, including maintenance and service to Avaya ECG Platform owners.

70.     After merging with Teldata, Black Box expanded its offerings of maintenance and service to Avaya ECG Platform owners through Teldata.

71.     Teldata was an authorized Avaya products distributor pursuant to a Dealer Agreement with Lucent dated as December 16, 1997 (assigned to Avaya as of October 1, 2000), which Avaya terminated as of July 27, 2005.

72.     In October 2000, Black Box and Clear Communications, Inc. ("Clear Communications") signed a merger agreement. Pursuant to that agreement, Black Box paid approximately $3,600,000 in Black Box stock plus a potential earn-out and certain other consideration to the owners of Clear Communications. Clear Communications provided telecommunications systems and services, including telephone systems, PBX systems, and structured cabling design, installation, and maintenance services, including maintenance and service to Avaya ECG Platform owners.

73.     After merging with Clear Communications, Black Box expanded its offerings of maintenance and service to Avaya ECG Platform owners through Clear Communications.

74.     Prior to the merger with Black Box, Clear Communications was an authorized Avaya products distributor. Avaya terminated its most recent Reseller Agreement, dated as October 8, 2002, with Clear Communication, as of June 25, 2005.

75.     In October 2000, Black Box and Smiles Communications Systems, Inc. ("Smiles Communications") signed a merger agreement. Pursuant to that agreement, Black Box paid approximately $3,100,000 in Black Box stock plus certain other consideration to the owner of

Smiles Communications.   Smiles Communications provided telecommunications systems and services, including KEY/Hybrid Telephone Systems, Digital PBXs, Voice Mail Systems, and structured cabling design, installation and maintenance services, including maintenance and service to Avaya ECG Platform owners.   Smiles Communications had entered into a Dealer Agreement with Lucent as of April 9, 1999.  Smiles Communications was also party to a Lucent Authorized Business Partner Advantage Agreement dated as of April 9, 1999.

76.     After merging with Smiles Communications, Black Box expanded its offerings of maintenance and service to Avaya ECG Platform owners through Smiles Communications.

77.     In August 2005, Black Box purchased assets (including all of its Avaya end-user customer contracts) from Black Box Universal Solutions N.A., Inc. ("Universal Solutions") for consideration up to $21,000,000.   Universal Solutions designed, sold, installed, repaired, serviced, and maintained commercial telephone systems, local and wide area network equipment, web-enabled telecommunications products and software from telecom manufacturers, provided systems integration services related to commercial computer and telecommunications networks, including network audits, system and software upgrades, and application integration, and provided network operations monitoring services, including, particularly, maintenance and service to Avaya ECG Platform owners.  Universal Solutions was an authorized Avaya products distributor pursuant to a Reseller Agreement dated August 1, 2002.

78.     Prior to the purchase, at Black Box's insistence, Universal Solutions wrote to Avaya to request Avaya's consent to the merger.   Avaya signed the consent containing an agreement that the requested Avaya consent would satisfy any and all requirements under the outstanding agreements between Universal Solutions and Avaya, including the Reseller Agreement, and a waiver of any right Avaya may have to terminate any of its agreements with Universal Solutions.  Avaya gave its signed consent as of August 8, 2005.

79.     After acquiring the assets of Universal Solutions, Black Box expanded its offerings of maintenance and service to Avaya ECG Platform owners through Universal Solutions.

80.     In December 2005, Black Box purchased the assets of Communication is World InterActive Networking, Inc. ("C=WIN") for approximately $9,500,000.  C=WIN  designed, sold, installed, repaired, serviced, and maintained advanced telephone systems, wireless networks, unified communication systems, converged voice/data/video networks, and related applications, including maintenance and service to Avaya ECG Platform owners.  C=WIN was an authorized Avaya products distributor pursuant to a Reseller Agreement dated as July 24, 2001.

81.     Prior to the purchase, at Black Box's insistence, C=WIN wrote to Avaya to request Avaya's consent to the merger.  Avaya signed the consent containing an agreement that the requested Avaya consent would satisfy any and all requirements under the outstanding agreements between C=WIN and Avaya, including the Reseller Agreement, and a waiver of any right Avaya may have to terminate any of its agreements with C=WIN.  Avaya gave its signed consent on December 12, 2005.

82.     After merging with C=WIN, Black Box expanded its offerings of maintenance and service to Avaya ECG Platform owners through C=WIN.

83.     Black Box acquired or merged with each of the herein-described entities precisely because they were all authorized to distribute Avaya products and provided maintenance and service to Avaya ECG Platform owners, and maintaining the already-existing good relationships with Avaya was of key importance.  As described in the foregoing paragraphs, Avaya encouraged Black Box to make such acquisitions and provided consent to Black Box's acquisitions so that Black Box could continue to expand its services as a growing provider of maintenance and repair services for users of AT&T, Lucent and Avaya products.

84.     Black Box paid more than $50 million to acquire the aforementioned Avaya maintenance and repair businesses.

85.     Throughout the period 2000-2006, with Avaya's encouragement, Black Box grew and invested in its Avaya service and maintenance business and entered into renewable multi-year service and maintenance contracts with its customers.

D.     **Avaya Imposes a New Contract with a New Non-Compete Agreement on Black Box and Its Other BusinessPartners**

86.     Upon information and belief, sometime after Avaya's spin-off from Lucent, Avaya's management underwent significant changes.  Among the changes, Avaya appointed a new management team to lead the Avaya Services division, which was responsible for Avaya's service and maintenance business.

87.     The new management team decided to reverse Avaya's prior policy to rely on dealers for the servicing of Definity and other ECG Platform systems.

88.     To reverse course, Avaya began implementing a series of actions designed to stifle the growing direct competition for the maintenance and service of Definity and other ECG Platform systems from its dealers, such as Black Box, and independent service providers.

89.     To avoid competition from dealers while still being able to rely on them under the dealer program to provide support to Definity and other ECG Platform owners, Avaya revised the standard dealer contract utilized by Lucent and created a new Avaya One reseller agreement.

90.     Unlike the pre-existing dealer contracts carried over from Lucent, the new Avaya One reseller agreement, designed for Avaya's dealers who Avaya now called "BusinessPartners," contained a strict and express non-compete provision that explicitly prohibited BusinessPartners from offering competitive maintenance contracts to any existing Avaya maintenance customer.

91.     This new restriction prohibiting competition for any existing Avaya maintenance customer was a term that had not applied to Black Box or, upon information and belief, any other dealer under any previous Lucent or Avaya contract.

92.     In or about April 2005, Avaya first advised Black Box of its intention to terminate Teldata's existing contract and replace it with the new one-year term Avaya agreement and, after several 30-day extensions of the old Teldata agreement, insisted that Black Box sign it.

93.     At Avaya's insistence, Black Box signed the proposed agreement, which included a termination without cause provision.   Avaya later relented and withdrew the offending language via an amendment dated as of October 11, 2005.

94.     In advance of the expiration of the 2005-2006 one-year agreement, Avaya advised Black Box that a new agreement containing a termination without cause provision would be required for the 2006-2007 agreement.  Despite Black Box protests, Avaya made it clear that Black Box had no choice but to sign the 2006-2007 agreement with such a provision, and Black Box did so.

**E.      Avaya Terminates Black Box's Contract**

95.     On or about June 25, 2007, despite knowing that Black Box had numerous multi-year service and maintenance contracts with its customers, Avaya advised Black Box of its intention to permanently terminate Black Box's existing contract with Avaya by not renewing upon the September 8, 2007 expiration.  Despite Black Box's repeated demonstration that it met all Avaya Platinum Master Reseller standards and over Black Box's vigorous objections, Avaya effectively terminated Black Box's Reseller status effective September 8, 2007.

96.     During the term of the 2006-2007 agreement, Black Box had received several accolades from Avaya.  Among other things, Avaya had audited Black Box's call center and confirmed that it met or exceeded all Avaya standards.  Upon completion of the audit, an Avaya national account manager wrote an e-mail in January 2007, which congratulated Black Box on its "terrific performance," and stated:

> "Congratulations on your Service Assessment for Level 3.  The service assessment is one of the key certification accomplishments for maintaining Black Box's Platinum Certification level."

97.     Similarly, on January 3, 2007, an Avaya national account manager provided a letter for Black Box to use, in which it stated, among other things:

> "This letter is confirmation that Black Box Network Services-Tennessee is an Avaya certified platinum BusinessPartner in good standing and is authorized to sell, install and implement Avaya's Enterprise

Communications and Small & Medium Business products and associated applications software and adjuncts.

Avaya works in concert with its BusinessPartners and maintains reviews of their certifications and performance.  We are very proud of their level of efficiency and *believe that Black Box Network Service-Tennessee will continue to maintain high standards of excellence in delivering communications solutions to the marketplace in the future*." (emphasis added).

98.      Prior to June 25, 2007, there was no reason for Black Box to believe that Avaya would change the longstanding course of conduct between Black Box and/or its acquired companies and Avaya.

**III.      Avaya's Abusive Control of System Access for Definity Platform Owners**

99.      Since terminating Black Box's 2006-2007 Master Reseller Agreement, Avaya has attempted to prevent Black Box and other independent service providers from providing maintenance and service of Definity and other ECG Platform systems through its control of the passwords and access codes necessary to perform remote and on-site maintenance and service on those systems.

100.      To overcome the access block and perform and execute the maintenance functions built into the Definity and other Legacy Platform equipment, an end-user requires, in addition to a user login and password, permission through the use of an MSP.  End-users who desired to maintain their own Avaya systems could "purchase" the MSP for a significant fee to Avaya.

101.      In the 1990s, to keep the access block in place while facilitating a dealer channel, AT&T and then Lucent also introduced an alternative password called the "DADMIN" login. Consistent with industry practice, AT&T and Lucent provided the DADMIN login to dealers at no charge upon written request from the owner.

102.      Upon information and belief, AT&T first inserted access blocks into its enterprise telecommunications systems while a legal monopoly, and continued to manufacture systems with an access block after its divestiture.  Existing systems did not have the access block removed, and new systems were installed with the access block in place.

103.    Upon information and belief, AT&T and Lucent typically did not disclose to first-time purchasers of Definity or other ECG platforms that their ability to access or use the commands embedded in the Definity or other ECG platforms could in any way be restricted. Avaya and its predecessors did not inform purchasers of AT&T, Lucent or Avaya equipment that, without MSPs, there were severe restrictions on which commands customers could execute. In addition, Avaya and its predecessors did not reveal to users of its equipment that, without MSPs, third party maintenance providers (such as Black Box and its predecessors) could not access all the commands required to perform maintenance.

104.    To the contrary, upon information and belief, owners were lead to believe that, with their purchase of the Definity or other ECG platform, they were purchasing the ability to access and utilize the commands to execute the maintenance functions necessary to maintain a system through its expected life-cycle, as an owner would with any other of Avaya's non-Definity systems or systems built by Avaya's competitors.  An owner would reasonably believe so because the ability to execute the maintenance functions is an integral part of the overall functionality of a Definity or other ECG system.

105.    Upon information and belief, despite the lack of disclosure about these access blocks, Avaya implemented a series of increasingly aggressive policies to restrict access to the necessary passwords and permissions in an apparent reaction to the inception of competition in the markets for service and maintenance contracts for the Definity or other ECG platforms.

106.    Avaya's restrictive policies culminated in or about July 2005 with a new policy whereby it completely withheld maintenance access from Definity and other ECG platform owners who did not have a maintenance contract with Avaya or one of Avaya's co-conspirator BusinessPartners.

107.    Upon information and belief, in 2004 and 2005, Avaya sought to justify its new restrictions on the use of maintenance access passwords and permissions by concocting so-called intellectual property rights to these passwords and permissions and commands embedded in the Definity and other ECG platforms.   Specifically, Avaya began to change its contracts with

owners by referring to the blocks as protection for their "proprietary maintenance software" and applying these new contracts retroactively to all Definity platforms, irrespective of when they were first purchased by the owner.  Avaya's recent assertion of its intellectual property rights to hold hostage the passwords and permissions, and thereby restrict access to commands and ability to provide maintenance, is merely a pretext for what is in fact an attempt to eliminate competition as well as an abuse of any purported copyrights Avaya may have in the passwords or maintenance software.

**IV.**     **Avaya's Conspiracy with BusinessPartners to Limit Competition**

108.    In addition to abusing the access blocks, passwords, and permissions, Avaya has continued to change its agreements with its dealers and related "policies and procedures," as set forth on Avaya's website, to further limit competition.

109.    In or about 2003, Avaya expressly advised that neither Avaya nor its BusinessPartners may solicit maintenance business for Avaya products from the existing customers of the other, and could not attempt to replace the other's service contracts regardless of where they are in the term of the contract.

110.    After Avaya limited competition from BusinessPartners, Avaya sought to placate its BusinessPartners.  Therefore, beginning in July 2005, Avaya conspired and agreed with certain BusinessPartners to bar competition from ISPs, by preventing ISPs from accessing the passwords and permissions necessary to service or maintain Definity systems.  By so conspiring, Avaya and its co-conspirator BusinessPartners have allocated among themselves the universe of Definity platform owners who purchase service and maintenance, at the direct expense of both the owners and the ISPs, who cannot compete without the passwords and permissions.

111.    With respect to those BusinessPartners that have nonetheless refused to join in this conspiracy and instead have attempted to compete directly against Avaya, Avaya has sought to eliminate that competition by terminating Avaya's agreements with such BusinessPartners and then disparaging the former BusinessPartner as an "unauthorized" service provider without any right to access any password and/or permission necessary to maintain an owner's system.  On

information and belief, Avaya has also interfered with such BusinessPartners' contractual relations in other ways.

112.    In furtherance of the conspiracy with Avaya, at least one BusinessPartner has interfered with Black Box's employment contracts with its personnel.  By its own admission on its website,[3] Carousel Industries, Inc. ("Carousel") was Avaya's "#1 Business Partner" in both 2005 and 2006.  On or about July 13, 2007, twenty-two Black Box employees from four Black Box locations in Southeastern states resigned, including managers, technicians, engineers, designers, sales representative, and administrative staff.  All twenty-two former Black Box employees went to work for Carousel.  Several of those former employees told a Black Box senior vice-president that the reason for their resignation was that Black Box was the impending termination of Black Box's Master Reseller Agreement with Avaya.  Several of those former Black Box employees who went to work at Carousel contacted Black Box customers in an attempt to shift proposals from Black Box to Carousel and to move maintenance services provided by Black Box to Carousel.

113.    As a result of Avaya's abuse of access blocks and passwords and permissions, Black Box has been placed in danger of default of some of its existing contracts with customers. Co-conspirator BusinessPartners benefit from such danger.  By way of example, in order to avoid defaulting on its support and maintenance portion of its Voice Services and Support Agreement with Electronic Data Systems Corporation ("EDS"), Black Box was forced to assign that portion of the agreement to Carousel on October 31, 2007.  Carousel has thus not only gained Black Box employees, but also been assigned Black Box support and maintenance contracts.

---

[3] See http://www.carouselindustries.com/about.aspx?id=140.

**V.      Owners Are Effectively Locked In To Their Definity and Other ECG Platforms**

114.    Avaya marketing literature does not disclose to purchasers that they must purchase post-warranty service and maintenance from Avaya or an authorized BusinessPartner. By the time an owner eventually discovers, post-warranty, that Avaya and its BusinessPartners have restricted its ability to access the passwords, permission, and parts needed to maintain its equipment, that owner is effectively locked into the use of the Definity or other ECG Platform and cannot realistically and economically replace its entire platform with one sold by another manufacturer simply to avoid Avaya's expensive and restrictive policies.  Moreover, the absence of comprehensive information about post-warranty service options (or lack thereof) made, and makes, it impossible for customers to accurately determine the overall life-cycle cost of purchasing and operating an Avaya system.

115.    Owners are locked into their Avaya telecommunications platform because the replacement cost of an enterprise telecommunications system is so great.  Definity and other ECG platforms can cost millions of dollars to purchase and require a significant amount of time to fully install and train users.

116.    The Definity platform has a useful life of over twenty years.  An owner, thus, cannot reasonably be expected to abandon its Definity platform mid-life cycle simply to avoid Avaya's restrictive policies.

117.    Aside from the significant costs to purchase a new enterprise telecommunications system, owners who switch to another manufacturer's system are forced to endure the disruption of installing a new system, which can take years to complete.

118.    The disruption to an owner is exacerbated by the need to train all employees on how to use the new system and to train staff technicians on the execution of the system's maintenance functions.  Owners who have used the Definity or other ECG platform for a significant period of time and have upgraded their systems within that platform are particularly affected because of the long history of use of the Avaya systems.

119.    As a result of the significant costs and burden to replace a Definity or other ECG platform, particularly to an owner who has used it for many years, Avaya systems owners are effectively locked into keeping these platforms for their entire useful life.  Once locked in, owners have little alternative but to pay Avaya whatever Avaya chooses to charge for service and maintenance for the duration of the platform's useful life.

## VI.    <u>Avaya's Interference with Black Box's Customers</u>

120.    Seeking to leverage the restrictive policies that lock an owner into a Definity or PDS platform and, thereafter, purchasing service or maintenance from Avaya or one of its chosen BusinessPartners, Avaya has recently initiated a campaign seeking to completely eliminate any competition from Black Box and other ISPs for the service and maintenance of Avaya equipment.

121.    To begin, despite knowing that Black Box has multi-year service and maintenance contracts with its customers, Avaya has directly contacted service and maintenance customers of Black Box (and, on information and belief, the customers of other ISPs) who had previously purchased Avaya maintenance contracts and advised those customers of Avaya's latest policy to refuse to provide any support to an owner who hires an ISP such as Black Box.

122.    Often, Avaya also expressly warns customers of Black Box and, on information and belief, other ISPs that Unauthorized Service Providers do not have access to any Avaya logins and that any unauthorized use of, or access to, MSPs or any Avaya Login is a violation of federal and state laws, or words similar to that effect.

123.    By the foregoing statement, Avaya clearly intends to convey to ISPs' customers, including Black Box's customers, that Black Box and its customers have engaged in illegal activity.

124.    Not resigned to simply using these scare tactics to win back business from Black Box and other ISPs, Avaya has actually directly interfered with the ability of the customers of Black Box and other ISPs to execute maintenance functions in their own phone systems.  Avaya has done so by accessing the Definity and other ECG Platform systems of Black Box's

customers such as Target Corporation stores, Macy's (which had purchased its MSP for a fee), International Paper, HCA Hospitals and British Petroleum sites, and other customers' sites, through improper and deceptive tactics, and then inserting a new access block that completely locks out the owner and any third-party service provider.  Avaya has accessed Black Box customer sites without such customers' knowledge or authorization.  In one such site, Avaya changed the maintenance parameters so that Black Box would not be notified of alarms in the event of a problem.  On information and belief, Avaya's conduct is continuing and expanding.

125.    Avaya has used increasingly aggressive tactics to lock out Definity and other ECG Platform owners from accessing and using commands on their own systems.  For example, upon information and belief, Avaya has asked former Avaya customers who have switched to Black Box for access into the owner's system for the express purpose only of shutting off the MSPs.  However, in at least one instance, after an owner allowed Avaya to access its system for an apparently legitimate purpose, Avaya did far more, and instead shut off all passwords and permissions, including DADMINs, in an attempt to prevent the owner from having any access to its own systems without hiring Avaya.

126.    Upon information and belief, Avaya apparently has even accessed an owner's system without providing any notice whatsoever to the owner, taking advantage of access gained to the system by a technician installing a part in a remote location.  Rather than simply installing the part, Avaya utilized the opportunity to insert a new access block into the owner's system that completely blocked the owner out of the system.

127.    As a result of Avaya's unauthorized access of the owner's system, the owner was completely unable to access or execute any maintenance functions.

128.    By its conduct, Avaya has demonstrated a clear intent to abuse the access blocks requiring passwords and permissions to completely eliminate all competition from ISPs and effectively eliminate the ability of disfavored BusinessPartners to compete against Avaya.

**VII.   Avaya's Interference with Black Box's Prospective Customers**

129.   In addition to interfering with Black Box's existing customers, Avaya has interfered with prospective contractual relations which Black Box would have enjoyed but for Avaya's wrongful conduct.

130.   An example of this involved Progressive Insurance.  Recently, Hewlett-Packard ("HP") approached Black Box to assist with responding to a request for proposal (RFP) from Progressive Insurance, requesting that Black Box participate in the proposal and plan to handle the maintenance and service of the equipment.

131.   Black Box contacted the Avaya national account manager, who encouraged Black Box to work with HP to respond to the Progressive RFP.  The Avaya national account manager first suggested that Black Box should keep Avaya "involved," so that Avaya would earn a commission or fee.

132.   To be certain that the relationship did not violate any known or unknown Avaya policies, Black Box's director of technical services contacted Avaya to request approval in writing.  The contract which Black Box was offered would have provided approximately $10.5 million in revenue over its 3-year term.

133.   Again, Avaya approved the HP-Black Box-proposal to Progressive but made it clear that Black Box should "include" Avaya in some respects so that Avaya would receive a fee or be paid as much as $750,000 to sell the MSP to Progressive.

134.   Progressive accepted the HP-Black Box proposal.

135.   Avaya then reversed course and disapproved the arrangement, claiming that it violated its policy against "3-tiering" and Avaya Vice President of Global Strategic Accounts made it clear that, if Black Box and HP went ahead with the Progressive deal, Avaya would deny access to the DADMINS and wouldn't let Progressive have MSPs.

136.   HP reported to Progressive that HP could not team with Black Box but, instead, would have to use Avaya as the service and maintenance provider.  Progressive declined to enter

into any relationship that involved Avaya maintenance and service and, instead, said that it wanted to go directly with Black Box for hardware, maintenance and service.

137.    The same Avaya Vice President of Global Strategic Accounts then made it clear that, if Black Box and Progressive did a direct contract (not in violation of any imagined 3-tiering restriction), Avaya would refuse to provide MSPs or DADMINS.

138.    The outcome of the Progressive debacle was that Avaya then raised its prices to HP, and Avaya got all of the Progressive business for itself.

139.    In connection with the Progressive RFP, an Avaya senior executive said words to the effect, "We are tired of Black Box poaching our business."

140.    Another example of Avaya's interference with prospective Black Box customers occurred in October 2007 when senior Avaya leadership informed a prospective Black Box customer that Avaya would not allow Black Box to provide maintenance and support to the prospective customer.  The Avaya employee further revealed that Avaya was planning to send a team to physically visit all Black Box customer sites which could not be remotely accessed in order to disable the DADMIN login, thus shutting out Black Box's ability to provide service and maintenance support to its customers.  The Avaya employee made it clear that Avaya would no longer honor any DADMIN activation requests from Black Box or other disfavored BusinessPartner, thus forcing the customer to turn solely to Avaya for maintenance and support. Adding yet further expense, Black Box's prospective customer was informed that Avaya would not provide maintenance unless the customer upgraded to Avaya's latest version if the customer's PBX was past its manufacturer's support period.

141.    In further pursuit of its anti-competitive goals, Avaya has also issued misleading press releases.  For example, on October 23, 2007, Avaya issued a press release hailing the sale of an Avaya Internet protocol telephony infrastructure to four sister institutions in the University System of Georgia.   Avaya's press release failed to mention that Black Box obtained the purchase order and contract in its own name.  Avaya misled readers into believing that the multi-site installation was an Avaya contract and project.

142.    Upon information and belief, Avaya has successfully squelched other Black Box business opportunities, as yet unknown to Black Box.

## VIII.   Avaya's Attempts to Recruit Black Box Personnel

143.    There have been several instances where Avaya has interfered with Black Box's employment contracts with its personnel.

144.    Even before Avaya had notified Black Box in June, 2007, that Avaya would not renew the Master Reseller Agreement, Avaya contacted one or more Black Box personnel to recruit such personnel to Avaya's employment and advised Black Box employees that Black Box would not be renewed as an Avaya BusinessPartner and, therefore, such employee should work for Avaya, which would eventually get all the Black Box business, or words to that effect.

145.    The impact on Black Box's business was very disruptive and made it difficult for Black Box to retain its trained Avaya technicians and other personnel who were experienced in selling, servicing and maintaining Avaya platforms.

## FIRST CAUSE OF ACTION

### (Monopolization in Violation of Section 2 of the Sherman Act)

146.    Plaintiff Black Box incorporates the allegations contained in paragraphs 1 through 145 of the Complaint as if set forth at length herein.

147.    For the purposes of this and the subsequent antitrust counts under the Sherman Act, 15 U.S.C. §§ 1-2, the relevant product market is the post-warranty service and maintenance for Avaya Definity and other ECG platform equipment, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts (the "Relevant Product Market"); the relevant geographic market is the United States (the "Relevant Geographic Market") (collectively, the "Relevant Markets").   Owners of Avaya Definity and other ECG platforms have no reasonably interchangeable substitutes for the service and maintenance of their Avaya equipment or purchase of maintenance contracts; the provision of service and

maintenance, maintenance contracts and parts for Avaya equipment are not interchangeable with other manufacturers' service, maintenance and parts.

148.     Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits, *inter alia*, monopolization of any part of the trade or commerce among states.

149.     Avaya has monopoly power in the Relevant Markets, as reflected by, *inter alia*: its substantial market share of the Relevant Markets; its control and market power over its passwords, permissions, and parts, which are necessary to compete in those Relevant Markets; its demonstrated ability to exclude third-party service providers from the Relevant Markets; and its ability to impose unreasonable and unnecessary costs and surcharges on "locked in" owners to gain access to the necessary passwords, permissions, or parts.

150.     Avaya's monopoly position has been acquired and maintained through exclusionary conduct, as opposed to superior product, business acumen, or historic accident.

151.     Pursuant to its anticompetitive scheme, as alleged above, after a period of cooperation with Black Box and other third party service providers and after encouraging Black Box and its acquired businesses to provide maintenance to owners of Avaya Definity platforms following Lucent's and Avaya's downsizing in 2000, Avaya is now exploiting its monopoly power to foreclose Black Box and other independent third party service providers from competing with Avaya and its hand-picked BusinessPartners in all or a substantial portion of the Relevant Markets.

152.     Avaya is willfully maintaining and extending its monopoly control over the Relevant Markets by the above-described exclusionary and predatory conduct.

153.     Avaya has further sought to maintain and extend its monopoly control over the Relevant Markets by misusing its purported "copyright" and trade secret rights in passwords, permissions, and access codes in an attempt to justify its exclusionary and predatory conduct.

154.     Avaya's conduct, including its use of lock-out passwords and permissions, is not motivated by technological or efficiency concerns and has no valid or legitimate business justification.  Rather, Avaya uses these justifications as a pretext to disguise its real purpose and

effect to harm competition and to injure Black Box and Avaya's other competitive rivals in the Relevant Markets.

155.    Access to Avaya's passwords and permissions is necessary for the maintenance of Avaya equipment.  It is impossible for a third party service provider, whether a dealer, an independent provider such as Black Box, or an owner to maintain and service Avaya equipment unless it has access to the passwords and permissions necessary to gain access to commands and the parts necessary to fix the equipment and provide maintenance.

156.    Under Avaya's view, Black Box cannot legally duplicate Avaya's passwords and permissions, and there are no alternative means for them to gain access to the Avaya Definity and other ECG platform equipment.

157.    However, having encouraged Black Box and other dealers to provide maintenance and service to owners of Definity equipment and having encouraged Definity platform owners to utilize dealers, such as Black Box, Avaya cannot now fairly deny dealers, former dealers or owners access to such equipment.

158.    Avaya's imposition on owners of Definity and other ECG platforms of unreasonable, unnecessary, and onerous terms for obtaining Avaya passwords and permissions, and prohibition against "unauthorized" service providers from obtaining the passwords and permissions at all, constitutes an effective denial of access to the passwords and permissions and makes it effectively impossible for Black Box and other independent service providers to compete with Avaya or its co-conspirator BusinessPartners for the provision of service or maintenance or sale of maintenance contracts in the Relevant Markets.

159.    Avaya's parts are also necessary for the service and maintenance of Avaya Definity and other ECG platform equipment.  It is impossible for a third party service provider, whether a dealer, an independent provider such as Black Box, or an owner to maintain Avaya equipment unless it has the parts and software patches necessary to fix the equipment.

160.   Black Box cannot duplicate Avaya's parts and software patches and there is no alternative means for Black Box to fully service or maintain Definity equipment without the Avaya parts.

161.   Avaya's software patches and service packs, collections of patches for a particular products or release, are also necessary for the service and maintenance of Avaya Definity and other ECG platform equipment, and cannot be reasonably duplicated by Black Box.

162.   Avaya's acts affect a substantial amount of interstate commerce in the Relevant Markets and constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2.

163.   Avaya's anticompetitive acts have caused substantial injury to Black Box, and have also injured and will injure competition in the Relevant Markets by, *inter alia*, foreclosing and sabotaging competition from Black Box and other competing third party service providers in the Relevant Markets and depriving owners of Avaya platforms of competing lower-cost, higher-quality alternatives for service and maintenance.

164.   As a direct and proximate result of Avaya's anticompetitive conduct, Black Box has been injured and will be injured in its business and property.  Black Box has lost and will lose significant profits and has lost the value of its more than $50 million investment in the Avaya service and maintenance shops it has acquired as detailed above.

## SECOND CAUSE OF ACTION

### (Attempted Monopolization in Violation of Section 2 of the Sherman Act)

165.   Plaintiff Black Box incorporates the allegations contained in paragraphs 1 through 164 of the Complaint, and repeats and re-alleges each and every paragraph in the First Cause of Action as if set forth at length herein.

166.   Section 2 of the Sherman Act, 15 U.S.C. § 2, prohibits, *inter alia*, attempts to monopolize any part of trade or commerce among states.

167.   Avaya's conduct, as alleged above, is anticompetitive and predatory.

168.    The relevant product market is the post-warranty service and maintenance for Avaya Definity and other ECG platform equipment, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts (the "Relevant Product Market") and the relevant geographic market is the United States (the "Relevant Geographic Market") (collectively, the "Relevant Markets").

169.    Avaya has undertaken its anticompetitive conduct, as alleged above, with the purpose of monopolizing, and with the deliberate and specific intent to monopolize, the Relevant Markets.   Avaya specifically intends to eliminate or foreclose competition in the Relevant Markets through the bundling and tying of the sales of Avaya Definity and other ECG platform equipment with the maintenance of Avaya Definity and other ECG platform equipment, and the passwords, permissions, and parts necessary to maintain Avaya Definity and other ECG platform equipment, and the other unlawful conduct alleged in this Complaint.

170.    Avaya's acts affect a substantial amount of interstate commerce in the Relevant Market and constitute monopolization in violation of the Sherman Act, 15 U.S.C. § 2.

171.    Avaya's anticompetitive acts have caused substantial injury to Black Box, and have also injured and will injure competition in the Relevant Markets by, *inter alia*, foreclosing and sabotaging competition from Black Box and other competing third party service providers in the Relevant Market and depriving owners of Definity platforms of competing lower-cost, high quality alternatives for service and maintenance.

172.    As a direct and proximate result of Avaya's anticompetitive conduct, Black Box has been injured and will be injured in its business and property.

173.    Absent action by this Court to enjoin and preclude Avaya from continuing its anticompetitive conduct, there is a dangerous probability that Avaya will succeed in obtaining a monopoly in the Relevant Market, including the power to eliminate and foreclose competition, raise prices, limit output, and reduce quality in that Market.

**THIRD CAUSE OF ACTION**

**(Tying in Violation of Section 1 of the Sherman Act)**

174.    Plaintiff Black Box incorporates the allegations contained in paragraphs 1 through 173 of the Complaint, and repeats and re-alleges each and every paragraph in the First and Second Causes of Action as if set forth at length herein.

175.    The anticompetitive conduct of Avaya, as set forth above, constitutes an unlawful restraint of trade which has harmed and continues to harm Black Box in its business and property and which has injured and continues to injure competition.

176.    The provision of maintenance and service of Avaya Definity and other ECG platform equipment to owners is a separate product from Avaya equipment and from "certified" repair and replacement parts for Avaya equipment.

177.    There is sufficient consumer demand for maintenance and service of Avaya's Definity equipment so as to render it efficient for Avaya to sell separately its equipment, on the one hand, and the maintenance and service of that equipment, on the other hand, and there is no technological reason why these products cannot be sold separately.

178.    Similarly, there is sufficient consumer demand for "certified" repair and replacement parts for Avaya Definity equipment so as to render it efficient for Avaya to sell separately its "certified" parts, on the one hand, and the maintenance and service of the equipment in which the "certified" parts are installed, on the other hand, and there is no technological reason why these products cannot be sold separately.

179.    Through its above-described conduct, including, but not limited to, its restricting access to its passwords, permissions, and "certified" parts, and the unreasonable and onerous surcharges to owners who elect to use an unaffiliated third party service provider such as Black Box, Avaya has conditioned (surreptitiously) the purchase of Avaya Definity and other ECG platform equipment on the purchase of service and maintenance for Avaya Definity and other ECG platform equipment.

180.   Similarly, Avaya has threatened to and refused to permit an owner who elects to use an unaffiliated third party service provider to purchase parts from Avaya or its authorized distributors or dealers.

181.   Upon information and belief, Avaya has substantial market share in the market for the manufacture and sale of Definity and other ECG platform telecommunications equipment, including, without limitation, all passwords, access blocks, permissions, software, including software patches and service packs,  and codes embedded in and/or necessary for the continuing operation of that equipment in the Relevant Geographic Market; this market share is sufficient to coerce a substantial percentage of owners of Avaya's Definity and other ECG platform equipment to purchase service and maintenance from Avaya or one if its chosen BusinessPartners, thereby distorting and/or eliminating competition in the Relevant Market.

182.   Avaya also has a substantial market share of "certified" Avaya parts, which are uniquely desirable to Definity and other ECG platform equipment owners.

183.   Upon information and belief, Avaya and its co-conspirator BusinessPartners and distributors have such substantial market share for such equipment and for "certified" parts for Definity and other ECG platform equipment in the Relevant Geographic Market as to constitute market power.

184.   As a result of the foregoing restrictions on competition among providers of maintenance and service to owners of Definity and other ECG platforms, such owners will pay higher prices to obtain maintenance and service of their Definity and other ECG platform equipment than they would in a fully competitive market, output will be limited, and quality will be reduced in that market.

185.   Avaya's conduct is particularly harmful to Definity and other ECG platform owners because Avaya, in selling its products, fails to conspicuously or expressly advise each purchaser of the surcharge it imposes on maintenance and service for access to passwords and permissions unless such owner obtains an Avaya maintenance or service contract.  As such, Definity and other ECG platform equipment owners cannot effectively factor these added service

and maintenance costs to determine full life-cycle costs when deciding whether to purchase an Avaya Definity or other ECG platform in the first instance.  Once these owners are "locked in" by the purchase of an expensive Avaya Definity or other ECG platform, Avaya is able to exploit its market power in the Relevant Market by extracting supracompetitive prices in the form of an access surcharge from the owner or by forcing the owner to purchase an Avaya maintenance or service program.

186.    Avaya also fails to conspicuously advise Definity or other ECG platform owners that, should they choose to hire an independent service provider for the service and maintenance of their Definity or other ECG platform systems, Avaya will refuse to allow the owner to purchase parts from Avaya or its distributors and dealers.

187.    If Avaya's tying is not unlawful *per se*, it is an unlawful restraint of trade under Section 1 of the Sherman Act as assessed under the rule of reason.  The anticompetitive consequences of Avaya's conduct outweigh any pro-competitive effects thereof.  Owners of Definity or other ECG platform equipment, irrespective of whether they purchased the product directly from Avaya or from an Avaya dealer, cannot obtain maintenance and service of such equipment from a company other than Avaya or a co-conspirator BusinessPartner without paying supracompetitive prices for such maintenance and service because of the unreasonable and unnecessary password surcharges and restrictions on parts.  Even then, the owner may not be able to continue to receive such service or maintenance by a company other than Avaya or its co-conspirator BusinessPartners if Avaya completely cuts off access to the necessary passwords, permissions, or parts, as Avaya has done to Black Box and its customers.

188.    Avaya's tying schemes harm Black Box by foreclosing it from all or a substantial portion of the Relevant Markets, and Black Box will sustain irreparable injury to its business, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

189.    Avaya's tying schemes affect a substantial volume of interstate commerce in the Relevant Markets and are unlawful under the Sherman Act, 15 U.S.C. § 1.

**FOURTH CAUSE OF ACTION**

**(Illegal Conspiracy in Violation of Section 1 of the Sherman Act)**

190.    Plaintiff Black Box incorporates the allegations contained in paragraphs 1 through 189 of the Complaint, and repeats and re-alleges each and every paragraph in the First, Second, and Third Causes of Action as if set forth at length herein.

191.    As described above, Avaya has orchestrated a horizontal conspiracy involving certain of its BusinessPartners, distributors of certified Avaya parts, and others to allocate the maintenance and service business of Definity and other ECG platform owners, to restrict the output of available maintenance and service, and, as a result, to fix and raise the prices of maintenance and service paid by owners.

192.    Avaya's conspiracy with its co-conspirator BusinessPartners to allocate maintenance and service business of Definity platform owners is a *per se* illegal conspiracy to allocate customers, restrict output and raise prices in violation of Section 1 of the Sherman Act.

193.    If Avaya's combination and conspiracy with its co-conspirator BusinessPartners is not unlawful *per se*, it is an unlawful restraint of trade under Section 1 of the Sherman Act as assessed under the rule of reason.  As described above, Avaya's scheme has harmed and continues to harm competition in the relevant markets and its procompetitive aspects, if any, are outweighed by its anticompetitive aspects.

194.    Avaya's acts affect a substantial amount of interstate commerce in the Relevant Markets and constitute an illegal conspiracy to allocate customers in violation of Section 1 of the Sherman Act, 15 U.S.C.

195.    Black Box has been and continues to be injured in its business and property, including loss of revenues, loss of profits, loss of trained employees, injury to reputation, and loss of goodwill.

## FIFTH CAUSE OF ACTION

### (Tortious Interference with Business/Contractual Relations)

196.    Plaintiff Black Box incorporates the allegations contained in paragraphs 1 through 195 of the Complaint, and repeats and re-alleges each and every paragraph in the First, Second, Third, and Fourth Causes of Action as if set forth at length herein.

197.    The conduct of Avaya, as set forth at greater length herein, constitutes tortious interference with Black Box's current business and/or contractual relationships with third parties.

198.    As noted, while still party to the Master Reseller Agreement with Black Box, knowing that many of Black Box's service and maintenance contracts are multi-year agreements, Avaya approached existing customers of Black Box to solicit them away from Black Box. Avaya was aware of their identity because Black Box was contractually obligated to provide that information.

199.    As noted, Avaya has also recently contacted customers of Black Box, has advised such customers that Black Box cannot fulfill its contractual obligations to its customers, and is engaging in illegal activity.

200.    Avaya has also directly accessed or attempted to access the Definity equipment of Black Box's customers, utilizing deceptive means, to lock out the ability of the customers and Black Box to execute commands necessary to effectively maintain the equipment.

201.    By approaching Black Box's service and maintenance customers in the manner described herein, Avaya has tortiously interfered with the business relations and/or agreements that Black Box has with its service/maintenance clients.

202.    Avaya has also interfered with Black Box's employment relationship with its employees by attempting to recruit them to Avaya by contending that Black Box will not be able to serve Avaya equipment customers.

203.    By engaging in such conduct, Avaya has tortiously interfered with Black Box's contracts with its employees.

204.    As a result of the foregoing conduct, Black Box has suffered damages.

## SIXTH CAUSE OF ACTION

### (Tortious Interference with Prospective Business or Economic Advantage)

205.    Plaintiff Black Box incorporates the allegations contained in Paragraphs 1 through 204 of the Complaint, and repeats and re-allege each and every paragraph in the First, Second, Third, Fourth, and Fifth Causes of Action as if set forth at length herein.

206.    The conduct of Avaya, as set forth at greater length herein, constitutes tortious interference with Black Box's prospective business advantages.

207.    Black Box has an expectation of obtaining an economic benefit as a consequence of its ability to provide service and maintenance business to Avaya Definity and other ECG platform equipment end users, including, but not limited to, renewal of its existing customer contracts.

208.    Avaya was aware of Black Box's opportunities to solicit and secure the business of servicing and maintenance of companies using Avaya Definity and ECG platform equipment, and of the benefits that Black Box would derive as a consequence of those service and maintenance contracts.

209.    Avaya's above-described conduct was an intentional and malicious interference with Black Box's expectant economic or business advantage.

210.    Black Box's existing service and maintenance business demonstrates a reasonable probability that Black Box's prospective business or economic advantage would have occurred but for Avaya's wrongful interference.

211.    As a consequence of Avaya's wrongful actions, Black Box has sustained damages.

## SEVENTH CAUSE OF ACTION

### (Injurious Falsehood)

212.    Plaintiff Black Box incorporates the allegations contained in paragraphs 1 through 211 of the Complaint, and repeats and re-alleges each and every paragraph in the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action as if set forth at length herein.

213.    Avaya has made, published, and transmitted statements which were knowingly false, made in reckless disregard for truth or falsity, or intended by Avaya to result in harm to Black Box, about the legality of Black Box's business conduct in the performance of service and maintenance of Definity and other ECG platform equipment, and the ability of Black Box to fulfill its service and maintenance contractual obligations to its customers, in oral and written communications directed to Black Box's existing and potential customers and others.

214.    The foregoing conduct was undertaken by Avaya with the intent of prejudicing and hindering Black Box in the conduct of its business and to deter others from dealing with Black Box.

215.    Avaya did not enjoy any privilege, of any kind, to make its false and misleading statements concerning Black Box's business conduct with the specific intent to harm Black Box.

216.    Black Box has suffered damages as the result of the false, misleading, and disparaging statements made by Avaya concerning Black Box's service and maintenance business.

## EIGHTH CAUSE OF ACTION

### (Equitable Estoppel)

217.    Plaintiff Black Box incorporates the allegations contained in paragraphs 1 through 216 of the Complaint, and repeats and re-alleges each and every paragraph in the First, Second, Third, Fourth, Fifth, Sixth, and Seventh Causes of Action as if set forth at length herein.

218.    Avaya induced Black Box to increase its service capabilities, the quality and scope of the service and support provided to Definity and other ECG Platform owners, to hire former Avaya employees, and to make additional investments to be able to service and maintain the Avaya / Lucent / AT&T systems as described above.  Avaya also induced Black Box through the implementation of the BusinessPartner program, its inclusion of Black Box in the BusinessPartner program, and through its continued assurances and accolades regarding Black Box's relationship with Avaya.

219.    In reliance on Avaya's encouragement and consents, Black Box acquired or merged with a number of entities with Avaya service and maintenance businesses at a cost to Black Box in excess of $50 million and entered into renewable multi-year service and maintenance contracts with its customers.

220.    Avaya has subsequently interfered with Black Box's ability to provide service to its customers as required by its multi-year service and maintenance contracts with its customers by accessing the Definity and other ECG Platform systems of Black Box's customers, through improper and deceptive tactics, and then inserting a new access block that completely locks out the owner and Black Box.

221.    Subsequently, Avaya has refused to provide DADMINs or other passwords and permissions in order to allow Black Box and other ISPs from accessing Definity and other ECG Platform systems of customers.

222.    Avaya also expressly warns customers of Black Box and, on information and belief, other ISPs that Unauthorized Service Providers such as Black Box do not have access to any of Avaya logins and that any unauthorized use of, or access to, MSPs or any Avaya Login including DADMIN, CRAFT, or INIT is a violation of federal and state laws, or words similar and to that effect.

223.    By its conduct, Avaya has demonstrated a clear intent to abuse the access blocks requiring passwords and permissions to completely eliminate all competition from independent

service providers and effectively eliminate the ability of BusinessPartners to compete against Avaya.

224.   However, having encouraged Black Box and other dealers to provide maintenance and service to owners of Definity and other ECG Platform systems and having encouraged Definity and other ECG Platform systems owners to utilize dealers, Avaya cannot now fairly deny dealers, former dealers or owners access to such systems.

225.   Therefore, Black Box is entitled to a judicial declaration that Avaya is equitably estopped from interfering with the service to and its relationships with its customers in any way.

## PRAYER FOR RELIEF

**WHEREFORE**, Black Box respectfully requests that this Court grant the following relief:

A.   Issue an Order permanently enjoining Avaya from:

(1)   withholding and refusing to disclose permission codes to Black Box's customers for any and all Avaya Definity and other Legacy Platform equipment sold, maintained, or serviced by Black Box or for any and all customers under a maintenance contract with Black Box;

(2)   withholding and refusing to disclose permission codes to Black Box for Black Box's customers for any and all Avaya Definity and other Legacy Platform equipment sold, maintained, or serviced by Black Box or for any and all customers under a maintenance contract with Black Box;

(3)   changing permission codes on Avaya Definity equipment sold, maintained, or serviced by Black Box, and/or on Avaya Definity and other Legacy Platform equipment of customers under a maintenance contract with Black Box, without the customers' written consent;

(4)   preventing customers of Black Box from purchasing Avaya parts;

      (5)     preventing Black Box from purchasing Avaya parts and software patches for service and maintenance for Black Box's customers for any and all Avaya Definity and other Legacy Platform equipment; and

      (6)     contacting Black Box customers.

B.     On all of Black Box's Causes of Action, an order precluding Avaya from engaging in the practice of providing access permissions to owners of Avaya Definity and other Legacy Platform equipment only upon payment of fees to Avaya.

C.     Pursuant to 15 U.S.C. § 26, *Fed. R. Civ. P.* 65, and the Court's inherent power, preliminarily and permanently enjoin Avaya from continuing its anticompetitive conduct, including, without limitation, the tying and bundling of the sales of telecommunications equipment, maintenance, and service contracts, and passwords and permissions necessary for maintenance and service, and from otherwise interfering with Black Box's competition with Avaya as an ISP;

D.     Pursuant to 15 U.S.C. § 15, award damages equal to treble the amount of the injuries sustained by Black Box as a result of Avaya's unlawful conduct, including attorneys' fees, interest, and costs.

E.     On all of Black Box's Causes of Action, compensatory, consequential, and other economic relief.

F.     On all of Black Box's Causes of Action, punitive damages.

G.     On all of Black Box's Causes of Action, for costs associated with this lawsuit and all reasonable attorneys' fees.

H.     On all of Black Box's Causes of Action, for such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**KIRKPATRICK & LOCKHART**
**PRESTON GATES ELLIS LLP**
*Attorneys for Plaintiff*
*Black Box Corporation*

| | |
|---|---|
| Dated:  December 31, 2007 | By:  /s/ **Anthony P. La Rocco**  |
| | Anthony P. La Rocco |
| **Of Counsel:** | |
| Thomas R. Johnson | |
| Pa. I.D. #11428 | |
| Jeremy A. Mercer | |
| Pa. I.D. #86480 | |
| KIRKATRICK & LOCKHART | |
| PRESTON GATES ELLIS LLP | |
| Henry W. Oliver Building | |
| 535 Smithfield Street | |
| Pittsburgh, PA 15222 | |
| (412) 355-6488 (telephone) | |
| (412) 355-6501 (facsimile) | |

## <u>CERTIFICATION UNDER L. Civ. R. 11.2</u>

I, Anthony P. La Rocco, hereby certify that I am a member of the law firm of Kirkpatrick & Lockhart Preston Gates Ellis LLP, attorneys for Plaintiff Black Box Corporation, and that certain of the subject matter in controversy in this case is substantially similar to, and the subject of, certain counterclaims in another court proceeding captioned <u>Avaya Inc. v. Telecom Labs, Inc.</u>, Civil Action No. 06-02490 (GEB/JJH).  The parties to that court proceeding are plaintiff Avaya Inc. and defendants/counterclaimants Telecom Labs, Inc., TEAMTLI.com Corp., and Continuant Technologies, Inc.

I certify that the foregoing statements by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

By:   <u>/s/ **Anthony P. La Rocco**  </u>
Anthony P. La Rocco (APL 5986)

Date: December 31, 2007