<u>NOT FOR PUBLICATION</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| | : | |
| BLACK BOX CORPORATION, | : | |
| | : | |
| Plaintiff, | : | Civ. No. 07-6161 (GEB) |
| | : | |
| v. | : | **MEMORANDUM OPINION** |
| | : | |
| AVAYA, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

<u>**BROWN, Chief Judge**</u>

        This matter comes before the Court upon the motion of plaintiff Black Box Corporation

("Black Box") for leave to file a Second Amended Complaint against defendant Avaya, Inc.

("Avaya"). [Docket No. 39]  This Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 1331, 1337.  The Court has considered the parties' submissions and decided the matter

without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth

below, this Court will grant in part and deny in part Black Box's Motion.

**I.      BACKGROUND**

        **A.      Procedural History**[1]

        This suit began on December 31, 2007 when Black Box filed a complaint against Avaya.

The case was reassigned to the undersigned on January 14, 2008.[2]

_____

        [1]The facts of this case are fully set forth in this Court's Memorandum Opinion entered on
August 29, 2008 [Docket No. 59].  Familiarity with such facts and terms defined therein is
assumed.

        [2] Parties sought transfer because this Court was already "presiding over a pending case,
Avaya Inc. v. Telecom Labs, Inc., 06-cv-2490 (GEB), that involves claims against Avaya that

## 1.   The Amended Complaint

On March 24, 2008, Black Box filed the Amended Complaint and Jury Demand ("Amended Complaint").  In the Amended Complaint, Black Box asserts eight causes of action: (1) Monopolization in violation of Section 2 of the Sherman Act; (2) Conspiracy to Monopolize in Violation of Section 2 of the Sherman Act; (3) Attempted Monopolization in Violation of Section 2 of the Sherman Act; (4) Tying in Violation of Section 1 of the Sherman Act; (5) Illegal Conspiracy in Violation of Section 1 of the Sherman Act; (6) Tortious Interference with Business/Contractual Relations; (7) Tortious Interference with Prospective Business or Economic Advantage; and (8) Equitable Estoppel.

### a.   PBX-related Claims

#### (1)   Sherman Act Section 2 Claims

The Amended Complaint alleged that Avaya has monopolized, conspired to monopolize and attempted to monopolize the relevant market consisting of "post-warranty service and maintenance for Definity and other ECG Platform equipment, including the submarkets for the provision of service and maintenance and the sale of maintenance contracts [in] the United States."  (Am. Compl. at ¶ 290.)  The Amended Complaint stated that there are "no reasonably interchangeable substitutes for the service and maintenance of . . . Avaya Definity equipment or [the] purchase of maintenance contracts."  (*Id.*) Black Box also alleged that "[d]issatisfied Avaya PBX owners . . . . are 'locked into' their PBX purchases" due to "extremely high switching costs

_____

arise out of the same set of facts and events. Among other things, the Telecom Labs case involves Counterclaims, including those under the federal antitrust laws, that are nearly identical to the Complaint in the Black Box case."  (Letter from Robert T. Egan, Jan. 9, 2008, Docket No. 6 at 1.)

. . . and . . . the PBX's extremely long useful life." (*Id.* at ¶ 291.)  Moreover, the Amended Complaint stated that "customers were not, at the time they purchased their systems, able to accurately predict the life-cycle cost of their system and compare it to the cost of purchasing a competitor's system."  (*Id.* ¶ 292.)

Black Box asserted that Avaya has "at least 60 percent" of the market share in the relevant market and so has market power due to this market share, its control over the logins, parts and upgrades, its proven ability to exclude third party servicers and its ability to charge supra-competitive prices. (*Id.* at ¶¶ 294-95.)   Allegedly, Avaya's monopoly power was acquired and maintained through intentional exclusionary conduct, including "tying and bundling maintenance to crucial patches and upgrades; threatening customers who use, or are considering using, Black Box's maintenance services; and constantly shifting its policies with regard to customers and ISPs' ability to access the customers' Avaya systems, the pricing of access to logins needed to self-maintain their products, and the customers' use of independent, 'unauthorized,' maintenance providers."  (*Id.* at ¶ 297.)

With respect to the attempt to monopolize claim, Black Box alleged that "Avaya specifically intends to eliminate or foreclose competition in the Relevant Markets through the tactics described above."  (*Id.* at ¶ 318.)   The Amended Complaint stated that "[a]bsent action by this Court . . . there is a dangerous probability that Avaya will succeed in obtaining a monopoly in the Relevant Markets."  (*Id.* at ¶ 322.)

With respect to the conspiracy to monopolize claim, Black Box alleged that "Avaya's conduct . . . has been undertaken not only individually but also in concert with, and pursuant to agreements with, its co-conspirator BusinessPartners."  (*Id.* at ¶ 310.)  The Amended Complaint

stated that "Avaya's and its co-conspirators' monopoly power" is evidenced by their collective market share, which is "over 90% of sales in the relevant market."  (*Id.*)

### b.      Tying in Violation of Sherman Act Section 1

The Amended Complaint stated that "[t]he provision of maintenance and service for Avaya Definity and other ECG Platform equipment (including software) . . . is a separate product from patches and upgrades for Avaya Definity and other ECG Platform equipment" and that "Avaya has conditioned the purchase or receipt of patches and upgrades . . . on the purchase of service and maintenance."  (*Id.* at ¶¶ 326, 328.)  Further, Black Box contended that "Avaya is the *only* source for patches and upgrades for Avaya Definity telecommunications systems."  (*Id.* at ¶ 329.)  Further, Black Box argued that the patches and upgrades "are the only way for systems owners to keep their systems functioning properly and at a state-of-the-art level."  (*Id.*) According to the Amended Complaint, "Avaya has told customers that if they obtain maintenance or services from ISPs . . . Avaya will not provide or sell them these crucial patches and upgrades."  (*Id.* at ¶ 328.)  This "forc[es] customers to choose Avaya maintenance and service over that of lower cost or better quality ISPs."  (*Id.* at ¶ 329.)  Black Box asserted that "[b]ecause it possesses market power in [patches and upgrades], Avaya's tying is unlawful *per se*."  (*Id.* at ¶ 331.)  Moreover, the Amended Complaint stated that the tying is also unlawful under the rule of reason.  (*Id.*)

### c.      Illegal Conspiracy in Violation of Sherman Act Section 1

Black Box alleged that, in violation of Section 1, "Avaya has orchestrated a horizontal conspiracy involving certain of its BusinessPartners, distributors of certified Avaya parts, and others to allocate the maintenance and service business of Definity owners, to restrict the output

of available maintenance and service, and, as a result, to fix and raise the prices of maintenance and service paid by owners." (*Id.* at ¶ 336.)  Black Box asserted that this is a *per se* illegal conspiracy, and is also illegal under the rule of reason.  (*Id.* at ¶¶ 337-38.)

> **2.    Avaya's Motion to Dismiss[3]**

On April 25, 2008, Avaya filed a motion to dismiss certain claims asserted in the Amended Complaint. [Docket No. 21.] In a Memorandum Opinion and Order entered August 29, 2008 [Docket No. 37] ("Memorandum Opinion"), this Court granted in part and denied in part Avaya's motion.

> **a.    PBX-related Claims**

> **(1)    Relevant Market**

The Court held that Black Box had sufficiently pled a plausible relevant market. (Mem. Op. at 16-22.)  The Court noted that "[t]he [Amended] Complaint states that the relevant product market for the antitrust claims is "the post-warranty service and maintenance for Definity systems . . . , including the submarkets for the provision of service and maintenance and the sale of maintenance contracts." (*Id.* at 17 (citing Am. Compl. at ¶ 290.))  The Court then held that "it is plausible that when purchasing an Avaya PBX system, the purchasers relied on using the ISPs' allegedly lower cost and higher quality service and maintenance." (*Id*. at 21.)  The Court further

---

[3]In its motion to dismiss, Avaya contended that the antitrust claims at issue in this case "are virtually identical to antitrust counterclaims asserted by Telecom Labs, Inc. and Continuant Technologies, Inc. in Avaya Inc. v. Telecom Labs, Inc., No. 3:06-cv-2490 (the 'TLI case')." (Avaya's Br. in Support of Motion to Dismiss at 2.)  Thus, Avaya contended that the claims "should be dismissed [for] much the same . . . reasons Avaya explained" in its brief in the TLI case.  (*Id.*)  The Court agreed that the claims in the instant case were virtually identical to counterclaims asserted in the TLI case.  Therefore, the Court disposed of the claims in a similar manner.

held that it is plausible that when Avaya made changes to its policies in March 2005 regarding

MSP usage so as to make it cost prohibitive for the Definity system owners to use an ISP in this

manner, Avaya was making a policy change that targeted "locked-in" Definity system owners

and in so doing violated antitrust law. (*Id.*)

### (2)     Section 2 Monopolization

The Court denied Avaya's motion with respect to the claims asserting monopolization.

(*Id*. at 23-26.)  Quoting *Eastman Kodak Co. v. Image Tech. Services, Inc*., 504 U.S. 451, 483 n.

32 (1992), the Court reasoned that while "'[i]t is true that as a general matter a firm can refuse to

deal with its competitors . . . such a right is not absolute; it exists only if there are legitimate

competitive reasons for the refusal.'" (*Id.* at 23-24 (internal citation omitted.)) As such, the Court

held that Black Box had alleged facts sufficient to survive a motion to dismiss with respect to

whether Avaya had a legitimate business justification for excluding ISPs from the market for

service and maintenance of Definity systems. (*Id.* at 24-25.)

### (3)     Section 2 Attempted Monopolization

Noting that Avaya's only argument with respect to this claim was that Black Box failed to

allege a plausible relevant market and having previously dispensed of this assertion, the Court

also denied Avaya's motion with respect to the attempted monopolization claims. (*Id*. at 25.)

### (4)     Section 2 Conspiracy to Monopolize

With respect to the claims alleging that Avaya had conspired to monopolize with

its BusinessPartners, the Court granted Avaya's motion, holding that Black Box had not

alleged facts sufficient to support a finding that the BusinessPartners had a specific intent to

monopolize. (*Id.* at 25-27.)

### (5)     Section 1 Tying Claim

This Court also granted Avaya's motion to dismiss the claims relating to tying in violation of Section 1 of the Sherman Act, in which Black Box alleged that "Avaya has conditioned the purchase or receipt of patches and upgrades for Definity . . . equipment (the 'tying products') on the purchase of service and maintenance for Definity systems, (the 'tied products')." (*Id*. at 27 (quoting Am. Compl. at ¶ 334).)  In so doing, the Court held that: (1) Black Box had not alleged facts to support a plausible relevant market encompassing the two tying products, patches and upgrades; (2) Black Box had defined patches and upgrades differently; (3) and therefore there is no indication that they are reasonably interchangeable. (*Id*. at 28-29.)

### (6)     Illegal Conspiracy in Violation of Section 1

The Court also addressed Black Box's Section 1 conspiracy claim, which alleged that Avaya had "orchestrated a horizontal conspiracy involving certain of its BusinessPartners, distributors or certified Avaya parts, and others to allocate the maintenance and service business of Definity owners, to restrict the output of available maintenance and service and, as a result, to fix and raise the prices of maintenance and service paid by owners." (*Id.* at 29 (quoting Am. Compl. at ¶ 336.))  Black Box argued that this was a *per se* illegal conspiracy, but that in the event the Court concludes that it is not *per se* unlawful, it is nevertheless an illegal conspiracy under the rule of reason. (*Id.* at 29 (quoting Am. Compl. at ¶ 337.))

The Court rejected Avaya's argument that the alleged conspiracy should be treated as a *per se* violation, reasoning that the alleged restraint involves not only a dual distributor relationship between the dealers in the PBX system sales market, but also a horizontal

arrangement in the service and maintenance aftermarket. (Mem. Op. at 31-34.)  In so holding, the Court noted that it had not found any Third Circuit cases that involve both a dual distributor arrangement in a primary market and a horizontal relationship in a plausible relevant aftermarket. (*Id*. at 32.)  However, the Court stated that, in *Dimidowich v. Bell & Howell*, 803 F.2d 1473 (9th Cir. 1986), the Ninth Circuit held that the alleged conspirators were in a "hybrid" arrangement composed of both a dual distributorship and a horizontal relationship. (*Id*. (citing *Dimidowich*, 803 F.2d at 1480-81.))  The Court then noted that, in *Dimidowich*, the Court reasoned that it did "'not have enough experience with [hybrid] arrangement[s] to say with any confidence that a concerted refusal to deal in this context almost always will be anticompetitive'" and so concluded that "'[b]ecause of the vertical element of the alleged 'hybrid' agreement, the restriction in the service market may well result in the same type of significant procompetitive effects in the product market as do restrictions in the context of a dual distributorship'" and therefore a rule of reason analysis would be appropriate. (Mem. Op. at 32 (citing *Dimidowich*, 803 F.2d at 1481.))

Turning to the instant case, the Court agreed with the reasoning in *Dimidowich*, noting that there was a dual distributor arrangement in the market for PBX systems and a horizontal relationship in the service and maintenance aftermarket. (Mem. Op. at 32-33.)  The Court further reasoned that, "[l]ike the Ninth Circuit, this Court does not have enough experience with this type of arrangement to say that it will almost always be anticompetitive." (*Id.*) As such, the Court concluded that a rule of reason analysis was appropriate.

The Court then rejected Avaya's argument that the conspiracy allegations with respect to Avaya and its BusinessPartners are not sufficiently particularized but also held that, to the extent

8

Black Box alleged the conspiracy extends to parties other than Avaya and its BusinessPartners, the claim is dismissed. (*Id.* at 34-35.)

### 3.      The Instant Motion

Black Box asserts that, pursuant to the parties' agreement during a January 14, 2009 status conference before Magistrate Judge John J. Hughes, counsel for Black Box sent Avaya's counsel a redlined draft of Black Box's Proposed Second Amended Complaint by email dated January 16, 2009 ("Proposed Amended Complaint"). (Black Box's Br. at 17 [Docket No. 39-2] (citing Decl. of Anthony P. LaRocco, Esq. ("LaRocco Decl." at Exh. C [Docket No. 39-3]).)

Black Box alleges that Avaya's counsel responded by e-mail on January 23, 2009, stating that Avaya did not object to Black Box's reassertion of claims asserted in the Amended Complaint that had not yet been dismissed or that were not the subject of Avaya's motion to dismiss, and that it did not object to the inclusion of Black Box's proposed new state law claim for Breach of the Covenant of Good Faith and Dealing,[4] but declined to consent to the reassertion of claims that the Court has already dismissed. As such, Black Box filed the instant motion on February 23, 2009, seeking leave to amend its complaint. The matter was fully briefed as of March 30, 2009.

### B.      The Proposed Amended Complaint

Black Box states that is seeks leave to amend its complaint for two reasons: (1) to "cure the deficiencies cited by the Court in its Memorandum Opinion"; and (2) "to assert a new state law claim against Avaya, alleging breach of the covenant of good faith and fair dealing." (Black Box's Br. at 1.)  As such Black Box asserts that the Proposed Amended Complaint otherwise

---

[4]Avaya does not dispute this. (Avaya's Opp. at 1 n. 1 [Docket No. 40].)

re-pleads, in substantially identical form, those causes of action that this Court declined to

dismiss in the Memorandum Opinion, namely: (1) the Section 2 monopolization and attempted

monopolization claims; (2) the Section 1 illegal conspiracy claim; and (3) its various state law

claims.  (*Id*. at 9.) Black Box also asserts that it does not seek to re-plead the Section 2

conspiracy to monopolize claim, which the Court dismissed in its Memorandum Opinion.  (*Id.*)

> ### 1.    The Re-pleaded Claims- *Per Se* Allegations in Section 1 Illegal Conspiracy Claims

Black Box seeks to re-plead its claim alleging that Avaya has engaged in an illegal

conspiracy under Section 1 of the Sherman Act by "orchestrat[ing] a horizontal conspiracy

involving certain of its BusinessPartners, distributors of certified Avaya parts, and others to

allocate the maintenance and service business of Definity owners, to restrict the output of

available maintenance and service, and, as a result, to fix and raise the prices of maintenance and

service paid by owners." (Prop. Am. Compl at ¶ 344. (attached as Exh. A to LaRocco Decl.))

As such, Black Box also reasserts that such actions constitute a *per se* illegal conspiracy, or in the

alternative, an unlawful restraint on trade under the rule of reason. (*Id.* at ¶¶ 445-46.)

> ### 2.    The Revised Claims- Section 1 Tying Claims

Black Box also seeks to amend the Amended Complaint in so far as it alleges that Avaya

engaged in tying in violation of Section 1 of the Sherman Act.  Black Box now asserts separate

and distinct causes of action for tying of patches to maintenance and the tying of upgrades to

maintenance. (*Id*. at ¶¶ 318-342)

> #### a.    Section 1 Tying Claims- Patches

With respect to patches, Black Box states that "[t]he provision of maintenance and

service for Definity . . . equipment (including software) is a separate product from patches for

Definity . . . equipment" and that "Avaya has conditioned the purchase or receipt of patches for

Definity and other ECG Platform equipment (the 'tying products') on the purchase of service and

maintenance for Definity  . . . equipment (the 'tied products') from Avaya and its

BusinessPartners."  (*Id*. at ¶¶ 320, 323.)  Black Box further alleges that "Avaya has told

customers that if they obtain maintenance or service from ISPs classified by Avaya as

'unauthorized,' Avaya will not provide or sell them these patches." (*Id.* at ¶ 323.)  Black Box

asserts that this conditioning represents a change in Avaya's earlier policy of not imposing such

restrictions and therefore Avaya systems purchasers could not have taken this tying into account

when assessing the life-cycle cost of purchasing an Avaya system. (*Id.* at ¶ 324.) Black Box also

asserts that Avaya is the only source for patches for the Definity systems. (*Id*. at ¶ 325.)

Black Box also avers that patches vary in importance, with some being system critical,

*i.e.* necessary for the proper functioning of the Avaya systems, while others are simply "uniquely

desirable for the performance of optional Avaya systems functions."  (*Id*. at ¶ 326.)   Black Box

alleges that, "[b]ecause locked-in systems-owners desire to keep their systems functioning

properly, and cannot reasonably anticipate whether their future need for patches will be system

critical or non-system critical, locked-in systems-owners are compelled to purchase service and

maintenance from Avaya or one of its chosen BusinessPartners."  (*Id*.)  As such, Black Box

states that Avaya "has market power in these products sufficient to coerce a substantial

percentage of owners of Avaya Definity  . . .  equipment to purchase service and maintenance

from Avaya or one of its chosen BusinessPartners", thereby effectively distorting and/or

eliminating competition in the relevant markets by forcing customers to choose Avaya

11

maintenance and service over lower cost and/or better quality maintenance and service offered by ISPs. (*Id*.)  Thus, Black Box alleges that Avaya's possession of market power in the tying products constitutes a *per se* violation or, in the alternative, is unlawful under the rule of reason. (*Id*. at ¶ 328.)

## B.     Section 1 Tying Claims- Upgrades

Black Box makes similar allegations with respect to upgrades.  Specifically, Black Box again alleges that "[t]he provision of maintenance and service for Definity . . . equipment (including software) is a separate product from upgrades for Definity . . . equipment" and that "Avaya has conditioned the purchase of upgrades for Definity and other ECG Platform equipment (the 'tying products') on the purchase of mandatory software support –or maintenance –for Definity and other ECG Platform equipment (the 'tied products')."  (*Id*. at ¶¶ 333, 335.) Similarly, Black Box alleges that "Avaya has told customers that, in order to purchase an upgrade to Avaya's latest release of PBX telecommunications software, the customer must purchase mandatory software support from Avaya." (*Id.* at ¶ 335.) Black Box alleges that, as with patches, this reflects a change in Avaya's earlier policy and therefore most Avaya systems purchasers could not have taken the change in account when assessing the life-cycle costs of purchasing an Avaya system. (*Id.* at ¶ 336.)  Similarly, Black Box also alleges that Avaya is the only source for upgrades for Definity telecommunications systems and that there are no substitutes for these upgrades. (*Id*. at ¶ 337.)

Black Box further asserts that "[u]pgrades are uniquely desirable and are critical for locked-in systems owners seeking to maximize the life of their Avaya PBX platforms and equipment at state-of-the-art levels." (*Id.* at ¶ 338.)  Black Box states that Avaya "seeks to force

customers to consider purchasing software upgrades by making announcements about Avaya's end-of-life and/or end-of-support of older software versions, including announcements that, over time, Avaya would cease support for customers with older versions of its software." (*Id.*) Therefore, Black Box contends that Avaya the has market power in these products sufficient to coerce a substantial percentage of owners of Avaya Definity equipment to purchase service and maintenance from Avaya and that this tying has the effect of distorting and/or eliminating competition in the relevant markets by forcing its customers to choose Avaya maintenance and service over lower cost and/or better quality maintenance and service offered by ISPs. (*Id.*)  Thus, Black Box asserts that Avaya's possession of market power in these tying products also constitutes a *per se* violation or, in the alternative, is unlawful under the rule of reason.  (*Id.* at ¶ 340).

## II.      DISCUSSION

### A.      Standard of Review

Federal Rule of Civil Procedure 15(a)(2) provides that, under the present circumstnaces, "a party may amend [its] pleading only with the opposing party's written consent or the Court's leave.  The Court should freely give leave when justice so requires."  The Supreme Court has identified several factors to be considered when applying Rule 15(a):

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.--the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing of the Virgin Islands, Inc.*, 663 F.2d 419, 425 (3d Cir. 1981), cert. denied, 455 U.S. 1018 (1982); *Newlin v. Invensys Climate Controls*, Civ. No. 05-5746 (RBK), 2006 U.S. Dist. LEXIS 61133, (D.N.J. August 16, 2006); *Long v. Wilson*, 393 F.3d 390, 400 (3d Cir. 2004); *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000); *Arthur v. Maersk, Inc.*, 434 F.3d 196, 204-05 (3d Cir. 2006) (stating that "leave to amend must generally be granted unless equitable considerations render it otherwise unjust.")

Thus, while "Rule 15(a) gives the court extensive discretion to decide whether to grant leave to amend after the time for amendment as of course has passed," CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 1486 (2d ed. 1990), Rule 15(a)'s "generous standard is tempered by the necessary power of a district court to manage a case" in light of the factors listed in *Foman. See Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 891 (5th Cir. 1987).

With respect to futility, "[it is] clear that an amendment would be futile when 'the complaint, as amended, would fail to state a claim upon which relief could be granted.'" *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1332 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997); *see also  Harrison Beverage Co. v. Dribeck Imps., Inc.*, 133 F.R.D. 463, 468 (D.N.J. 1990), reasoning that an amendment is futile if it "is frivolous or advances a claim or defense that is legally insufficient on its face," (citations and quotations omitted).)  As such, "[i]n assessing 'futility,' the district court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." *Burlington*, 114 F.3d at 1434 (citing *Glassman*, 90 F.3d at 623) (further citation omitted)).

14

B.      **Sherman Act**

1.      **Section 1**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  15 U.S.C. § 1.  "To establish a violation of Section 1, a plaintiff must prove: (1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action."  *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005).

To determine whether a particular action unreasonably restrains trade, courts have applied one of two different methods of analysis: (1) the *per se* rule; and (2) the rule of reason.  Under the *per se* rule, certain categories of restraints are simply presumed to be unreasonable and no elaborate inquiry is necessary.  *See, e.g., Business Elecs. Corp. v. Sharp Elecs. Corp*., 485 U.S. 717, 723 (1988) ("*per se* rules are appropriate only for 'conduct that is manifestly anticompetitive'") (quoting *Continental T.V., Inc. v. GTE Sylvania Inc.,* 433 U.S. 36, 50 (1977)).  On the other hand, the rule of reason, which is the "prevailing standard," ordinarily requires the Court to engage in a detailed analysis of the effect that the restraint has on competition in a relevant market.  *See Sylvania Inc*., 433 U.S. at 49 (holding that the rule of reason typically requires a detailed examination "in light of the competitive situation in 'the product market as a whole'"); *United States v. Brown Univ.*, 5 F.3d 658, 672 (3d Cir. 1993) (holding that the rule of

reason "ordinarily requires a detailed inquiry into the market impact of a restraint").[5]

 2. **Section 2**

Section 2 of the Sherman Act provides as follows:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 2.  The "right to maintain a private cause of action for damages arising under Section 2 of the Sherman Act flows from Section 4 of the Clayton Act."  *Schuylkill Energy Resources, Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 413 (3d Cir. 1997).  Section 4 of the Clayton Act provides, in relevant part, that "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent." 15 U.S.C. § 15(a).

To state a claim for monopolization under Section 2, a party must allege facts sufficient to show: "(1) the possession of monopoly power in a relevant market and (2) the willful

---

[5]"[A] third standard that falls somewhere between the rule of reason and per se standards" is the "quick look" rule of reason.  *Rossi v. Standard Roofing, Inc.*, 156 F.3d 452, 461 n.6 (3d Cir. 1998).  This method "applies in cases where per se condemnation is inappropriate but where no elaborate industry analysis is required to demonstrate the anticompetitive character of an inherently suspect restraint."  *Gordon*, 423 F.3d at 209-210 (citing *Brown Univ.*, 5 F.3d at 669). Under the "quick look" method, "the competitive harm is presumed and the defendant must set forth some competitive justification for the restraints." *Id.* at 210.  "[T]he quick look approach may be applied only when an observer with even a rudimentary understanding of economics could conclude that the arrangement in question would have an anticompetitive effect on customers and markets." *Id.*

acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident." *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 481 (1992) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

To state a claim for attempted monopolization, a party must allege facts sufficient to show: (1) predatory or anticompetitive conduct; (2) specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports v. McQuillan*, 506 U.S. 447, 456 (1993); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997). "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456.

### C.    Application

#### 2.    The Re-pleaded Claims- *Per Se* Allegations in Section 1 Illegal Conspiracy Claims

Black Box seeks to re-plead its claim alleging that Avaya has engaged in an illegal conspiracy under Section 1 of the Sherman Act, including that such actions constitute a *per se* illegal conspiracy. (Prop. Am. Compl. at ¶¶ 343-48.)  In so doing, Black Box argues that "[t]he Court merely found that it was appropriate to analyze Avaya's motion to dismiss that claim under the Rule of Reason standard rather than the *per se* rule because the Court lacked experience with the type of arrangement under consideration (a dual distributor arrangement in the market for the PBX system and a horizontal relationship in the service and maintenance aftermarket) to conclude that such an arrangement would almost always be anticompetitive under the *per se*

rule." (Black Box's Br. at 15 (citing (Mem. Op. at 32-33)).  Black Box notes this Court's

reliance on *Dimidowich* and argues that such citation does not dictate a contrary conclusion

because *Dimidowich* was decided at the summary judgment stage, not the pleading stage.  (*Id.* at

16 (citing *Dimidowich*, 803 F.3d at 1476).)  Further, Black Box notes that, in *Dimidowich*, the

court held that "one justification for rule of reason analysis of restrictions in the context of a dual

distributorship is that they provide corresponding benefits in the interbrand market," and that, in

the instant case, there is no reason to infer that the dual distributorship arrangement will

automatically confer a procompetitive benefit in the interbrand market for service and

maintenance of Avaya systems because, in addition to the dual distributorship arrangement,

Black Box has also alleged horizontal restraints involving agreements between Avaya and its

BusinessPartners to restrain competition in the service and maintenance aftermarket.  (*Id.* at 16

(citing  *Dimidowich*, 803 F.3d at 1481.))  In light of the foregoing, Black Box argues that the

Court should not deny them the opportunity to pursue this alternative theory of *per se* liability

under Section 1 before discovery has concluded.  (*Id.* at 17.)

  Avaya argues that Black Box should not be permitted to reassert these allegations of *per

se* liability because, in the Memorandum Opinion, the Court held that Black Box could not

pursue this claim and that, because Black Box had failed to seek reconsideration of the Court's

ruling in a timely fashion, the Court's ruling on the issue should not be disturbed.  (Avaya's Opp.

at 5-6)  Avaya further argues that, even if Black Box had moved for reconsideration of the

court's ruling in a timely fashion, their request would have been denied because they cannot

show that: (1) new evidence is available; (2) supervening new law has been announced; or (3) the

Court's decision was clearly erroneous and would create manifest injustice. (*Id*. at 5 (citing *In re*

*Ins. Brokerage Antitrust Litig,*, No. MDL 1663, 2007 U.S. Dist. LEXIS 64767, at *53 (D.N.J. Aug. 31, 2007) (internal citations omitted.))

Avaya further argues that Black Box's arguments that the Court did not dismiss the *per se* claims are specious.  Avaya argues that Black Box misconstrues the Court's language regarding its experience with dual distributorships, thereby ignoring Supreme Court precedent that "the *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, and only if the courts can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." (Avaya's Opp. at 6-7 (quoting *Leegin Creative Leather Products, Inc. v. PSKS, Inc.*, 551 U.S. 877, 886-87 (2007) (intenal citations omitted)).) Avaya further asserts that Black Box's argument that *Dimidowich* is distinguishable because it was decided at the summary judgment stage is not relevant to the inquiry into the appropriateness of the application of the *per se* rule as a matter of law and further notes that similar *per se* claims have been dismissed by other courts under Rule 12(b)(6).  (*Id.* at 7 (citing *Bedi v. Hewlett-Packard Co.*, 2008 U.S. Dist LEXIS 102672, at *1-*7 (D. Mass. Nov. 17, 2008); *Spahr v. Treadway*, 2008 U.S. Dist. LEXIS 90079, at *14-*22 (E.D. Tenn. Aug. 20, 2008)).  Finally, Avaya also contends that Black Box asserts that Avaya must prove that any arrangement that Black Box challenge is on balance "pro-competitive" in order to avoid *per se* treatment. (*Id*. at 8 (citing *Leegin*, 551 U.S. at 886 ("To justify a *per se* prohibition a restraint must have 'manifestly anticompetitive' effects." (further citations omitted)).)

The Court concludes that Black Box cannot continue to assert its *per se* claims with respect to its claims alleging an illegal conspiracy in violation of Section 1 because this Court held, as a matter of law, that the alleged conspiracy between Avaya and its BusinessPartners

should not be treated as a *per se* violation.  (Mem. Op. at 32-33.)  While it is true that the

Memorandum Opinion does not explicitly state that Avaya's motion to dismiss was granted with

respect to Black Box *per se* claims, the Court nevertheless clearly concludes that the "alleged

conspiracy should not be treated as a *per se* violation" and instead "a Rule of Reason analysis is

appropriate." (*Id.*)  This assessment is a legal conclusion, which cannot be disturbed under the

law of the case doctrine, which instructs courts to adhere to decisions of law, once made,

throughout the course of a case in the absence of "extraordinary circumstances." *See, e.g., In re*

*City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998); *United States v. Kikumura*, 947 F.2d 72,

77 (3d Cir. 1991).  Such extraordinary circumstances include instances where: (1) new evidence

is available; (2) supervening new law has been announced; or (3) the earlier decision was clearly

erroneous and would create manifest injustice. *City of Phila*, 158 F.3d at 718 (further citations

omitted). Here, Black Box does not allege the presence of any of these "extraordinary

circumstances."  As such, the Court holds that Black Box's motion for leave to amend is denied

with respect to their *per se* claims asserted in the Proposed Amended Complaint alleging illegal

conspiracy in violation of Section 1 of the Sherman Act.

## 2.    The Revised Claims- Section 1 Tying Claims

Black Box argues that the Court should permit it to amend the Amended Complaint in so

far as it alleges that Avaya engaged in tying in violation of Section 1.  Black Box asserts that

these proposed amendments address and resolve the issues cited by the Court in its dismissal of

the Section 1 Tying claims without prejudice in the Memorandum Opinion.  (Black Box's Br. at

12 (quoting *Borelli v. City of Reading*, 532 F.2d 950, 951 (3d. Cir. 1976) (reasoning that a

district court's order dismissing a pleading, without prejudice, includes an "implicit invitation to

amplify the complaint," even if the order does not mention amendment.))  Black Box asserts that it seeks to address the Court's holding that they had failed to allege facts sufficient to support a plausible relevant market encompassing the two tying products: patches and upgrades. (Black Box's Br. at 26 (citing Mem. Op. at 30).)  Black Box notes that the Court held that Black Box had not alleged facts sufficient to support a plausible relevant market encompassing the two tying products: patches and upgrades  (Black Box's Br. at 12 (citing Mem. Op. at 28).)

Black Box asserts that the Proposed Amended Complaint "makes clear that Avaya had tremendous market power over each of the two tying products at issue patches and upgrades" (*Id.* at 13 (citing Prop. Am. Compl. at ¶¶ 16, 17, 213, 262)).

Black Box contends that the Proposed Amended Complaint also alleges that: (1) Avaya has "tremendous market power" over both patches and upgrades because Avaya is the only source for patches and upgrades for such Avaya PBX systems; (2) by virtue of its market power over these products, Avaya has been effective at coercing a significant number of Avaya PBX owners to purchase service and maintenance from Avaya and/or its BusinessPartners (for patches) or software support or maintenance from Avaya (for upgrades); (3) the product markets for each of these products are separate and distinct from the product market for maintenance and service of Avaya systems; and (4) there is sufficient customer demand that Avaya can sell or furnish both produces separately from maintenance and service and that there is no countervailing technological reason that would require the products to be sold together. (*Id.* at 13-14 (citing Prop. Am. Compl. at 15-17, 213, 262, 320, 323, 324, 333)).

### a.      Patches

In contrast, Avaya argues that Black Box should not be permitted to amend its Section 1

Tying Claims because such amendments fail to state a claim upon which relief could be granted and therefore are futile. (Avaya's Opp. at 9 (citations omitted).)   With respect to patches, Avaya argues that "Black Box's principal complaint is that Avaya's July 1, 2005 Service Bulletin provided that 'Product Correction Notices ('PCNs') of a *non-system critical nature* would no longer be available without an Avaya maintenance contract.'" ((*Id.* at 11 (quoting Prop. Am. Compl. at ¶ 213 (emphasis added)).)   Avaya argues that "[n]owhere does Black Box allege that Avaya PBX owners that deal with unauthorized service providers are denied access to 'necessary' patches, and the characterization of non-critical patches as 'uniquely desirable' does not alone elevate their antitrust significance." (*Id.*  at 12.)   According to Avaya, because Black Box does not allege that Avaya limited access to "necessary" patches, their market definition fails because Black Box cannot plausibly assert that any PBX owner ever relied on unrestricted availability of non-critical patches when determining whether to purchase an Avaya PBX system. (*Id.* at 12-13.)

Avaya further argues that these claims are futile because Black Box only alleges that Avaya PBX owners "reasonably believed," based on Avaya's prior practices, that they are entitled to non-critical patches regardless of whether they use an ISP to perform maintenance. (*Id*. at 13.)   Avaya argues that "[w]hether or not any Avaya PBX 'owner' had the 'belief' that Black Box attribute to all 'owners' and whether or not this belief was 'reasonable" are immaterial." (*Id.*)   Instead, Avaya contends, Black Box must assert "plausible allegations that the 'owners' relied on some assessment of the likelihood of the availability of desirable non-critical patches *and* somehow factored this assessment in their life cycle costing, or cost of ownership analysis, *at the time of their Avaya PBX system purchases*." (*Id.* at 14-15 (emphasis in original).)

The Court concludes that Black Box has put forth sufficient allegations to state a claim upon which relief could be granted, and so the proposed claims relating to tying patches are not futile. *Burlington*, 114 F.3d at 1434. "Tying is defined as selling one good (the tying product) on the condition that the buyer also purchase another, separate good (the tied product)." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp*., 959 F.2d 468, 475 (3d Cir. 1992) (*en banc*); *see also Allen-Myland, Inc. v. International Business Machines Corp*., 33 F.3d 194, 200 (3d Cir. 1994). "The antitrust concern over tying arrangements is limited to those situations in which the seller can exploit its power in the market for the tying product to force buyers to purchase the tied product when they otherwise would not." *Queen City Pizza*, 124 F.3d at 442-43 (quoting *Town Sound,* 959 F.2d at 475).

"Even if a seller has obtained a monopoly in the tying product legitimately (as by obtaining a patent), courts have seen the expansion of that power to other product markets as illegitimate and competition suppressing." *Town Sound*, 959 F.2d at 475. As such, tying requires "appreciable economic power" in the tying product market. *Harrison Aire, Inc. v. Aerostar Int'l*, 423 F.3d 374, 385 (3d Cir. 2005) (citing *Kodak*, 504 U.S. at 464; *Brokerage Concepts v. U.S. Healthcare, Inc*., 140 F.3d 494, 516-17 (3d Cir. 1998)).

"The first inquiry in any § 1 tying case is whether the defendant has sufficient market power over the tying product, which requires a finding that two separate product markets exist and a determination precisely what the tying and tied products markets are." *Queen City Pizza*, 124 F.3d at 443 (citing *Allen-Myland*, 33 F.3d at 200-201). Here, Black Box has alleged that "[t]he provision of maintenance and service for Definity . . . equipment (including software) is a separate product from patches for Definity . . . equipment" and that "Avaya has conditioned the

23

purchase or receipt of patches for Definity . . . equipment (the 'tying products') on the purchase

of service and maintenance for Definity . . . equipment (the 'tied products') from Avaya and its

BusinessPartners." (*Id.* at ¶¶ 320, 323.)   Further, Black Box has also put forth sufficient

allegations that patches are a distinct and separate product from the provision of maintenance and

service for Avaya PBX systems.  (*Id.* at ¶ 321.) "There is sufficient consumer demand for

maintenance and service of Avaya's Definity . . .  equipment so as to render it efficient for Avaya

to sell or furnish separately patches for those systems on the one hand and the maintenance and

service of that equipment on the other hand, and there is no technological reason why these

products cannot be sold or provided separately.")  Black Box has also alleged that Avaya has

market power over patches in that: (1) patches are only available from Avaya (*i.e.*, that Avaya has

a 100% market share); (2) patches are unique (*i.e.*, there are no available substitutes); (3) they are

uniquely desirable to ensure proper functioning of Avaya PBX systems; (4) Avaya has been

successful in forcing locked-in customers to accede to the tie-in of patches to service and

maintenance; and, (5) that those locked-in customers have, as a result, paid supra-competitive

prices for service and maintenance inferior to that available from ISPs. (*Id.* at ¶¶ 16, 216, 325,

326, 327.)

Avaya's arguments to the contrary are unavailing.  As Black Box notes, it did not limit

the aftermarket to non-critical patches as Avaya contends. (Avaya's Opp. at 11-12.)  Rather,

Black Box alleges that the aftermarket includes both critical and non-critical patches. (Prop. Am.

Compl. at ¶¶ 319, 326.)  Further, such a distinction between critical and non-critical patches is

immaterial.  Black Box has alleged that locked-systems owners cannot reasonably anticipate

whether their future need for patches will be system critical or non-system critical, and so are

24

compelled to purchase service and maintenance from Avaya or one of its chosen BusinessPartners and that this contributes to Avaya's market power over the patches. (*Id*. at ¶ 326.)  Additionally, even if the aftermarket were limited only to non-critical patches, the fact remains that Black Box has sufficiently alleged that Avaya PBX purchasers could not obtain these non-essential patches without also committing to purchases maintenance and service for their PBX systems from Avaya or its BusinessPartners.

The Court also rejects as irrelevant Avaya's argument that these claims are futile because Black Box failed to allege "plausible allegations" that Avaya PBX owners relied on and factored into their assessment of lifecycle costing of a PBX system the availability of critical and non-critical patches.  (Avaya's Opp. at 12-14.)  As Black Box notes, Avaya has cited to no case law for the proposition that "[w]hether or not any Avaya PBX 'owner' had the 'belief' that Black Box attribute to all 'owners' and whether or not this belief was 'reasonable' are immaterial." (Black Box' Rep. at 8; Avaya's Opp. at 14-15.)  The Court concludes that, at this stage, it is sufficient for Black Box to allege that Avaya's prior practices with respect to the availability of patches would lead owners or end-users of Definity systems to reasonably believe that they are entitled to and will receive patches for the systems they have purchased from Avaya, irrespective of whether they use an ISP to perform maintenance. (*See* Prop. Am. Compl. at ¶ 215.)

As such, Black Box' motion for leave to amend is granted with respect to the claims in the Proposed Amended Complaint asserting Section 1 Tying violations with respect to patches.

### b.    Upgrades

With respect to upgrades of PBX systems, Avaya argues that Black Box "does not and cannot plausibly allege that, when deciding whether to purchase an Avaya PBX system, any

purchaser ever relied on the fact that it would in the future be able to obtain an upgrade to CM

5.0 software without buying software support from Avaya." (Avaya's Opp. at 15.)  As support,

Avaya notes that Black Box alleges that, when Avaya released the CM 5.0 PBX system in late

2007, it announced a new policy in which Avaya separated its offers for service and maintenance

contracts for software versus hardware and required owners to purchase a software maintenance

agreement from Avaya in order to obtain an upgrade to CM 5.0 or purchase CM 5.0 as part of a

new systems sale. (*Id*. at 15-16 (citing Prop. Am. Compl. at ¶¶ 251, 253, 254).)  Avaya further

notes that Black Box points to the policy change that took place on July 1, 2005 to allege that a

"Definity owner who uses an ISP for maintenance, including hardware is effectively prohibited

from upgrading to CM 5.0, even if the Definity owner is willing to purchase [the software

maintenance agreement]." (Avaya's Opp. at 16. (quoting Prop. Am. Compl. at ¶ 257).)  Avaya

asserts that, in light of such allegations, it is unreasonable to infer that any customer relied on the

fact that Avaya would release the CM 5.0 software upgrade without requiring the purchase of

support at the time of purchasing an Avaya PBX because: (1) prior to late 2007, no PBX owner

could have known that Avaya would release the CM 5.0 software upgrade; and (2) the policy

change announced by Avaya in July 2005 occurred more than two years before Avaya released

CM 5.0.. (Avaya's Opp. at 16-17.)  Thus, Avaya argues that there is no likelihood that an Avaya

purchaser factored the costs of the CM 5.0 software upgrade in its lifecycle cost analysis. (*Id.* at

17.)

       Avaya further asserts that Black Box alleges that Avaya also requires the purchase of CM

5.0 software support in order to obtain an upgrade to CM 5.0 or to purchase that software as a

part of a new systems sale. (*Id*. at 17-18 (citing Prop. Am. Compl. at ¶¶ 252-54).)  Avaya argues

that it follows from this statement that "any requirement that the purchasers of a new CM 5.0 system or the software upgrade also purchase Avaya software was implemented as a business strategy for the interbrand market, in which it competes with the other original equipment manufacturers ("OEMs") in the sale of PBX systems." (Avaya's Opp. at 18.)

Additionally, Avaya contends that Black Box's proposed tying market of only CM 5.0 software upgrades also fails because it does not include PBX systems manufactured by Avaya's competitors and therefore "'clearly does not encompass all interchangeable substitute products.'" (Avaya's Opp. at 19 (quoting *Queen City Pizza*, 124 F.3d at 436).)  Finally, Avaya contends that these claims are futile because "there is no tied product" since Black Box fails to sufficiently allege that software support for the upgrade is a relevant aftermarket separate from the upgrade itself or that Black Box can provide or has ever provided software to support the upgrade. (Avaya's Opp. at 18.)  Avaya argues that Black Box's assertion that Avaya will decline to provide software support to a purchaser of the CM 5.0 software upgrade under the July 1, 2005 policy change is "no more than an assertion that Avaya's alleged 'policy change' applies to its CM 5.0 PBX system and accompanying software- the core of Black Box's monopolization claim." (*Id.* at 19.)

The Court concludes that Black Box has put forth sufficient allegations to state a claim upon which relief could be granted, and so the proposed claims relating to tying of upgrades in PBX systems is not futile. *Burlington*, 114 F.3d at 1434.  As with its allegations with respect to patches, Black Box has alleged that "[t]he provision of maintenance and service for Definity . . . equipment (including software) is a separate product from upgrades for Definity . . . equipment" and that "Avaya has conditioned the purchase of upgrades for Definity  . . . equipment (the 'tying

products') on the purchase of mandatory software support –or maintenance –for Definity . . .
equipment (the 'tied products')." (*Id.* at ¶¶ 333, 335.)  Further, Black Box has sufficiently
asserted that Avaya has market power over upgrades in that Black Box alleges that: (1) upgrades
are only available from Avaya (*i.e.*, that Avaya also has a 100% market share over upgrades); (2)
upgrades are unique (*i.e.*, there are no available substitutes); (3) upgrades are critical in allowing
systems owners to maximize the useful life of their systems; and (4) Avaya has been successful
in coercing locked-in customers to accede to the tie-in of upgrades to service and maintenance.
(*Id.* at ¶¶ 17, 262, 337, 338.)

Avaya's contentions that Black Box's allegations do not sufficiently set forth that PBX
owners relied on the future availability of software upgrades when deciding whether to purchase
an Avaya PBX system is belied by the Proposed Amended Complaint.  Specifically, Black Box
alleges that "[u]ntil recently, Avaya has never refused to sell upgrades to customers of ISPs," but
that now Avaya has "shifted its policies regarding the conditions under which it would make
these unique and desirable upgrades available." (Prop. Am. Compl. at ¶ 17.)  Further, Avaya's
argument that Black Box's proposed tying market fails because it does not include PBX systems
manufactured by Avaya's competitors and therefore does not encompass all interchangeable
substitute products is similarly unavailing because Black Box is asserting that Avaya PBX
system owners are locked into using upgrades rather than replacing their systems and that this
fact demonstrates that upgrades are a separate market in which Avaya has market power.  (*Id.* at ¶
17, 262, 337, 338.)  As such, Black Box is alleging that there are no reasonably interchangeable
products for upgrades, not for PBX systems.  *See Queen City Pizza*, 124 F.3d at 436 ("The outer
boundaries of a product market are determined by the reasonable interchangeability of use or the

28

cross-elasticity of demand between the product itself and substitutes for it.") (internal citations omitted.)

Similarly, the Court is not convinced by Avaya's argument that Black Box has not alleged a tied product because it fails to sufficiently allege that software support for the upgrade is a relevant aftermarket separate from the upgrade itself or that Black Box can provide or have ever provided software to support the upgrade. (Avaya's Opp. at 19). The Proposed Amended Complaint defines the tied product as the "provision of maintenance and service for Definity . . . equipment (including software)" and further states that "Black Box, like other ISPs, has provided and is capable of providing service and maintenance for Avaya PBX systems." (Prop. Am. Compl. at ¶¶ 333-34.)  As such, the Court grants Black Box's motion as it relates to the claims alleging tying with respect to upgrades of PBX systems.

### 3.    New State Law Claim- Breach of the Covenant of Good Faith and Dealing

As both parties note, Avaya consents to Black Box's addition of this new state law claim alleging breach of covenant of good faith and dealing.  (Avaya's Opp. at 1 n. 1; Black Box's Br. at 19.)  As such, Black Box's motion with respect to this claim is also granted.

29

III.   **CONCLUSION**

For the foregoing reasons, Black Box's motion for leave to file an amended complaint is granted in part and denied in part.  Specifically, the Court grants Black Box's motion in all respects except for the reassertion of the allegations of *per se* violations with respect to the Section 1 illegal conspiracy claims in the Proposed Amended Complaint.  An appropriate form of order is filed herewith.


Dated: September 8, 2009



      s/ Garrett E. Brown, Jr.
      GARRETT E. BROWN, JR., U.S.D.J.